Jared R. Woodfill V
WOODFILL & PRESSLER, LLP
2 Houston Center
909 Fannin Street, Suite 1470
Houston, Texas 77010
Telephone:    (713) 751-3080
Facsimile:     (713) 751 3058
e-mail:         jrykerw@gmail.com

# 12  CV  03398

*Pro Se for Defendants Woodfill & Pressler LLP and Jared R. Woodfill V*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LFR COLLECTIONS LLC, <br><br> *Plaintiff* <br><br> v. <br><br> WOODFILL & PRESSLER, LLP; and JARED R. WOODFILL V, <br><br> *Defendants.* | Case No.: _____ <br><br> **NOTICE OF REMOVAL OF CIVIL ACTION** <br><br> (Originally filed in the Supreme Court of the State of New York, County of New York, Index No. 650934/2012 |

Defendants Woodfill & Pressler LLP and Jared R. Woodfill V hereby give notice that the Civil Action bearing the above captioned name and pending as Index No. 650934/2012 in the Supreme Court of the State of New York, County of New York, is hereby removed to this Court based upon the following grounds for removal:

1.    Plaintiff LFR Collections LLC filed its Notice of Motion for Summary Judgment in Lieu of Complaint and its Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in Lieu of Complaint on March 26, 2012 in the Supreme Court of the State of New York, County of New York. Copies of such Notice of Motion and Memorandum of Law (including the Affidavit of Kathleen M. Servidea, and the exhibits attached thereto) are attached hereto as Exhibit 1.

2.      Plaintiff had a summons issued on March 26, 2012.  A copy of such summons is attached hereto as Exhibit 2.

3.      Plaintiff had copies of the Summons, Notice of Motion, and Memorandum of Law served for receipt by Defendants on March 29, 2012.  Copies of Plaintiff's Affirmation of Service is attached hereto as Exhibit 3.

4.      The Defendants joined in this Notice of Removal constitute all the Defendants who have been served in this matter and all of the Defendants who have been named in this matter.

5.      Plaintiff's summary judgment motion initiated a civil action.

6.      Although not alleged in Plaintiff's summary judgment motion, Plaintiff is a limited liability company organized in the State of Delaware with its principal place of business in the State of Connecticut.

7.      Defendant Woodfill & Pressler LLP is a limited liability partnership organized in, and with its principal place of business in, the State of Texas.

8.      Defendant Jared R. Woodfill V is a resident and domiciliary of the State of Texas, as are all partners of Woodfill & Pressler LLP.

9.      None of the Defendants is a resident of the State of New York.

10.     Plaintiff's motion for summary judgment alleges that the amount in controversy is at least $29,264,564, exclusive of pre- and postjudgment interest and costs.

11.     Because the civil action initiated by Plaintiff is between citizens of different states and involves an amount in controversy in excess of $75,000, exclusive of interest and costs, there is original jurisdiction in this Court over Plaintiff's cause of action pursuant to 28 U.S.C. § 1332(a)(1).

12.     Accordingly, this action is removable to this Court pursuant to 28 U.S.C. § 1441(a) and (b).

13.     Pursuant to 28 U.S.C. § 1446(b), Defendants are filing this Notice of Removal within 30 days after their receipt of copies of the initial pleading setting forth the claim for relief upon which this civil action is based.

14.     This Court is the court for the federal district embracing the place where the state court action is pending.

15.     The civil action so brought by Plaintiff in the Supreme Court of the State of New York, County of New York, is therefore removable to this Court pursuant to 28 U.S.C. §1441.

16.     Promptly after the filing of this Notice of Removal, Defendants will give written notice thereof to Plaintiffs and will file a copy of the notice with the clerk of the state court in which Plaintiff's action has been pending.

17.     Exhibits 1 through 3 attached hereto are copies of all process, pleadings, and orders served upon the Defendants in the state court action.

WHEREFORE, this action is removed to this Court.

Dated: April 24, 2012

Jared R. Woodfill V
WOODFILL & PRESSLER LLP
River Oaks Green
3131 Eastside, Suite 450
Houston, Texas 77098
Telephone:     (713) 751-3080
Facsimile:     (713) 751 3058
e-mail:     jrykerw@gmail.com
Pro Se for Defendants

A copy of the foregoing was served
by overnight delivery service sent the
25th day of April, 2012 to:

Joseph De Simone
Lawrence M. Barnes
Mary M. Makary
Mayer Brown LLP
1675 Broadway
New York, New York  10019
Attorneys for Plaintiff


Richard S. Van Dyke
Van Dyke & Associates, APLC
4660 La Jolla Village Drive, Suite 1070
San Diego, CA  92122-4615
Telephone:      (858) 558-8475
Facsimile:      (858) 356-5584
e-mail:         rvandyke@vdalaw.com

NOTICE OF REMOVAL

1

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
— — — — — — — — — — — — — — — — — — — — X

LFR COLLECTIONS LLC,                                     :

               Plaintiff,                          :

                                :

     - against –                                        :

WOODFILL & PRESSLER, L.L.P. and                          :          Index No. _i650934/2012_
JARED R. WOODFILL V,                                     :

            Defendants.                    :

— — — — — — — — — — — — — — — — — — — — X


### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT


MAYER BROWN LLP
1675 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-2500

*Attorneys for Plaintiff LFR Collections LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

    A.    The Loan to Woodfill Firm and Woodfill's Personal Guaranty ............................ 1

    B.    Defendants Fail to Repay Loan at Maturity .................................................. 5

    C.    The Transfer to LFR of All Right, Title, and Interest to the Woodfill Assets ............................................................................................................ 6

ARGUMENT ....................................................................................................... 8

I.    LFR IS ENTITLED TO SUMMARY JUDGMENT IN LIEU OF COMPLAINT TO ENFORCE THE AMENDED NOTE, THE FORBEARANCE AGREEMENT, AND THE WOODFILL GUARANTY ................................... 8

    A.    Applicable Legal Standard ........................................................................... 8

    B.    The Amended Note ...................................................................................... 8

    C.    The Forbearance Agreement ....................................................................... 9

    D.    The Woodfill Guaranty .............................................................................. 10

    E.    Costs, Expenses, and Attorneys' Fees ....................................................... 12

CONCLUSION ................................................................................................... 13

# TABLE OF AUTHORITIES

Page

CASES

*AFCO Credit Corp. v. Eshaghian,*
    217 A.D.2d 676 (2d Dep't 1995) ........................................................................... 10

*Bank of America, N.A. v. Solow,*
    59 A.D.3d 304 (1st Dep't 2009) ........................................................................... 10

*Boland v. Indah Kiat Fin. (IV) Mauritius Ltd.,*
    291 A.D.2d 342 (1st Dep't 2002) ......................................................................... 11

*Brest v. Kleidman,*
    300 A.D.2d 133 (1st Dep't 2002) ......................................................................... 10

*Cantrade Privatbank AG Zurich v. Bangkok Bank Pub. Co.,*
    256 A.D.2d 11 (1st Dep't 1998) ........................................................................... 10

*Chase Manhattan Bank, N.A. v. Marcovitz,*
    56 A.D.2d 763 (1st Dep't 1977) ...................................................................... 11, 12

*Chem. Bank v. Nemeroff,*
    233 A.D.2d 239 (1st Dep't 1996) ......................................................................... 11

*European Am. Bank & Trust Co. v. Schirripa,*
    108 A.D.2d 684 (1st Dep't 1985) ......................................................................... 11

*Int'l Bus. Mach. Corp. v. Murphy & O'Connell,*
    183 A.D.2d 681 (1st Dep't 1992) ......................................................................... 12

*Jason Trading Corp. v. Lason Trading Corp.,*
    303 A.D.2d 180 (1st Dep't 2003) ......................................................................... 10

*Mangiatordi v. Maher,*
    293 A.D.2d 454 (2d Dep't 2002) .......................................................................... 10

*Milliken & Co. v. Stewart,*
    182 A.D.2d 385 (1st Dep't 1992) ......................................................................... 11

*Rhodia, Inc. v. Steel,*
    32 A.D.2d 753 (1st Dep't 1969) ........................................................................... 11

*Seaman-Andwall Corp. v. Wright Machine Corp.,*
    31 A.D.2d 136 (1st Dep't 1968) .................................................................... 8, 11, 12

*Shearson Lehman Hutton, Inc. v. Myerson & Kuhn,*
    197 A.D.2d 410 (1st Dep't 1993) ........................................................................... 9

ii

## TABLE OF AUTHORITIES
(continued)

Page

*Solomon v. Langer*,
66 A.D.3d 508 (1st Dep't 2009) ............................................................... 9

*Takeuchi v. Silberman*,
41 A.D.3d 336 (1st Dep't 2007) ............................................................... 9

*Valencia Sportswear, Inc. v. D.S.G. Enters., Inc.*,
237 A.D.2d 171 (1st Dep't 1997) ........................................................... 11

*Wachovia Bank, N.A. v. Silverman*,
84 A.D.3d 611 (1st Dep't 2011) ............................................................... 9

*Warburg, Pincus Equity Partners, L.P. v. Keane*,
22 A.D.3d 321 (1st Dep't 2005) ......................................................... 9, 10

**STATUTES**

CPLR 3212(b) ............................................................................................. 8

CPLR 3212(e) ............................................................................................. 8

CPLR 3213 ......................................................................................... passim

CPLR 5012 ................................................................................................. 8

Plaintiff LFR Collections LLC ("LFR") respectfully submits this memorandum of law in support of its Motion for Summary Judgment in Lieu of Complaint against Defendants Woodfill & Pressler, L.L.P. ("Woodfill Firm") and Jared R. Woodfill V (collectively, "Defendants").

## INTRODUCTION

LFR brings this action to recover $29,264,564 (consisting of an acknowledged outstanding indebtedness of $20,404,990.47, additional principal advances of $175,000, and accrued interest and fees of $8,684,574, as of February 29, 2012), plus pre- and post-judgment interest, fees, expenses, and attorney's fees and costs, under a Revolving Credit Note as amended, a Forbearance Agreement, and an Unlimited Guaranty. Pursuant to the Amended Note and the Forbearance Agreement, Woodfill Firm agreed to repay the entire principal amount and all accrued interest on the maturity date of September 30, 2010. Woodfill Firm failed to do so. Jared R. Woodfill V ("Woodfill"), the owner and principal of Woodfill Firm, personally guaranteed the loan. Despite repeated requests, to date, neither Woodfill Firm nor Woodfill has repaid the principal amount and accrued interest, and they continue to be in default.

## STATEMENT OF FACTS

### A.    The Loan to Woodfill Firm and Woodfill's Personal Guaranty

LFR brings this action to recover $29,264,564 (consisting of an acknowledged outstanding indebtedness of $20,404,990.47, additional principal advances of $175,000, and accrued interest and fees of $8,684,574, as of February 29, 2012), plus pre- and post-judgment interest, and attorneys' fees and costs, under the Amended Note, Forbearance Agreement, and Woodfill Guaranty. (*See* Servidea Aff. ¶ 19.) On or about March 1, 2006, Gerova Asset Backed Holdings, LP f/k/a The Stillwater Asset Backed Fund, LP d/b/a The Stillwater Asset-Backed Fund LP (the "Lender") extended credit to Woodfill Firm under a Revolving Credit Note (the "Note") and a corresponding Credit Agreement (the "Credit Agreement"), each executed by

Woodfill Firm and evidencing a credit line from the Lender in the maximum principal amount of five million dollars.  (*See id.* ¶¶ 1-2; Exs. A and B, respectively.)  As part of the loan arrangement, the Lender was granted a continuing security interest in all of Woodfill Firm's personal property, fixtures, and interests (the "Security Agreement"), and the principal of Woodfill Firm executed an absolute and unconditional personal guaranty with respect to the credit extended (the "Woodfill Guaranty").  (*See id.* ¶¶ 3-4; Exs. C and D, respectively.)  Woodfill also executed a Pledge Agreement (the "Pledge Agreement"), granting the Lender a continuing security interest in Woodfill's collateral. (*See id.* ¶ 5; Ex. E.)

Pursuant to the Note and the Credit Agreement, Woodfill Firm agreed to repay the entire loan amount, plus 19% simple interest per annum for the first year and 21% simple interest per annum after the first year and until the Maturity Date, which is defined in Section 1.1 as "the earlier to occur of (i) [March 1, 2008], . . . and, (ii) such date as the Loans shall otherwise be payable in full in accordance with the terms of this Agreement."  (Credit Agreement § 2.2.2, Ex. B to Servidea Aff.)  Woodfill Firm further agreed that, upon an Event of a Default, it would pay interest, to the extent permitted by law, on the unpaid loans at a rate of 4% in excess of the rate otherwise applicable.  (Note § A, Credit Agreement § 2.2.3, Exs. A and B to Servidea Aff., respectively.)  Among the events constituting "Events of Default," the Credit Agreement includes failure to pay when due the principal of any loan, the interest on any loan, or any fee, charge or other amount due under the Credit Agreement when such amounts become due and payable.  (Credit Agreement §§ 7.1.1, 7.1.2, Ex. B to Servidea Aff.)  Both the Note and the Credit Agreement provide that Woodfill Firm further agreed to reimburse all costs and expenses incurred in connection with the enforcement or collecting on the Note.  (Note § C(2), Credit Agreement § 8.1, Exs. A and B to Servidea Aff., respectively.)

In connection with the Note and the Credit Agreement, Woodfill executed the Woodfill Guaranty, an unlimited, unconditional, and continuing guaranty of payment of the obligations under the Note and the Credit Agreement, as consideration for the Lender's extension of credit. (*See* Ex. D to Servidea Aff.).  Pursuant to the Woodfill Guaranty, Woodfill agreed to "absolutely, unconditionally and irrevocably" guarantee to the Lender the payment of the Woodfill Firm's principal and all fees, costs, and expenses under the Note and the Credit Agreement.  (Woodfill Guaranty at 2.01, Ex. D to Servidea Aff.)  Section 2.02 describes the Woodfill Guaranty as:

> absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Credit Agreement, the Revolving Credit Note or any other agreement or instrument . . . , and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 2.02 that the obligation of [Woodfill] shall be absolute and unconditional, under any and all circumstances.

(Woodfill Guaranty § 2.02, Ex. D to Servidea Aff.)  Like the Note and the Credit Agreement, the Woodfill Guaranty provides that Woodfill agreed to reimburse all costs and expenses incurred in connection with the enforcement or collecting on the Note and the Credit Agreement.  (Woodfill Guaranty at 2.01, Ex. D to Servidea Aff.)

As Woodfill Firm continued to draw down its credit line, Woodfill Firm executed amendments to the Note and the Credit Agreement.  The subsequent four amendments namely increased the credit line's maximum principal amount, adjusted the interest rate, and extended the Maturity Date.  (*See* Exs. F, G, H, I, J, K, L, and M to Servidea Aff.)  By June 30, 2009, the Note and Credit Agreement as amended evidence an increased credit line from the Lender in the maximum principal amount of $16,000,000 and an extended Maturity Date of September 30, 2009.  (*See* Exs. I and M to Servidea Aff., respectively.)  In connection with the amendments to the Note and the Credit Agreement, Woodfill executed confirmations of the Woodfill Guaranty.

3

The confirmations of the Woodfill Guaranty confirmed various terms of the Woodfill Guaranty, including that the Woodfill Guaranty is in "full force and effect" and that Woodfill "has no defenses or offsets with respect to the obligations to the [Lender] under [the Woodfill Guaranty]." (*See* Exs. N, O, P, and Q to Servidea Aff.)

On June 11, 2009, Woodfill provided written confirmation of various terms of the Note and the Credit Agreement and the existing status of the credit line. (*See* Ex. R to Servidea Aff.) On behalf of Woodfill Firm, Woodfill agreed that, among other things, as of May 31, 2009: (1) the total loan commitment was 15,000,000; (2) the amount outstanding was $15,573,829.19; (3) the interest rate was 18.25%; (4) the Maturity Date was June 30, 2009; and (5) the interest outstanding was $244,336.09. (*Id.*) Again, on February 26, 2010, Woodfill provided written confirmation of various terms of the Note and the Credit Agreement and the existing status of the credit line. (*See* Ex. S to Servidea Aff.) On behalf of Woodfill Firm, Woodfill agreed that, among other things, as of December 31, 2009: (1) the principal amount unpaid was $18,504,813.61; (2) the interest rate was 18%; and (3) the Maturity Date was September 30, 2009. (*Id.*)

Finally, on or around May 17, 2010, Woodfill Firm executed a Forbearance Agreement and Amendment to the Credit Agreement (collectively with the Credit Agreement as amended, the "Forbearance Agreement"), acknowledging an indebtedness totaling $20,404,990.47, and a corresponding Fifth Amended and Restated Revolving Credit Note (the "Amended Note"), increasing the maximum principal amount to $20,655,000 and extending the Maturity Date to September 30, 2010. (*See* Servidea Aff. ¶¶ 11-13; Exs. T and U to Servidea Aff., respectively.)

In the Forbearance Agreement, Woodfill on behalf of Woodfill Firm acknowledged indebtedness totaling $20,404,990.47 as well as acknowledging default pursuant to the Credit

Agreement. (*See* Servidea Aff. ¶¶ 11-12.) The Forbearance Agreement further stated that neither Woodfill Firm nor Woodfill:

> have any claims or set-offs against the Obligations, nor do they have any defenses to, or counterclaims respecting, the enforcement or administration of their respective obligations evidenced by the Financing Agreements and under applicable law. [Woodfil Firm and Woodfill] shall not assert or seek to assert any claim, set-off, defense or counterclaim of any kind or nature whatsoever with respect to the Financing Agreements.

(Forbearance Agreement § 2(d), Ex. T to Servidea Aff.) Additionally, by executing the Forbearance Agreement, Woodfill Firm and Woodfill released the Lender, its successor and assigns from "all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever." (Forbearance Agreement § 8, Ex. T to Servidea Aff.) Likewise, Woodfill confirmed the Woodfill Guaranty by executing the Forbearance Agreement and "[waived] any defense to his obligations under the [Woodfill] Guaranty under any theory whatsoever . . . " (Forbearance Agreement § 6, Ex. T to Servidea Aff.)

### B.   Defendants Fail to Repay Loan at Maturity

By the Maturity Date of September 30, 2010, Woodfill Firm failed to repay the loan principal and all accrued interest. (Servidea Aff. ¶ 16.) Having triggered an Event of Default, the Lender provided Woodfill Firm and Woodfill with notice of default and demand for repayment ("Default Notice"). (*See id.* ¶ 18; Ex. X to Servidea Aff.) Notwithstanding repeated efforts to procure payment of the loan and accrued interest, as of February 29, 2012, neither Woodfill Firm nor Woodfill had repaid the funds owed. (*See* Servidea Aff. ¶¶ 16-19; Ex. V to Servidea Aff.) Thus, as of September 30, 2010, Defendants had become unconditionally liable for all outstanding principal, accrued interest, and default interest at the rate of 22.25%. (*Id*; *see also* Ex. B § 2.2.3 and Ex. K § 2(c) to Servidea Aff.)

In addition to Woodfill Firm's failure to repay the amounts due and owing under the

Amended Note, Forbearance Agreement, and Woodfill Guaranty, Woodfill Firm also violated other terms of the Credit Agreement.   Namely, the Credit Agreement provides that monies advanced "shall be used to fund the working capital needs of [Woodfill Firm]" (Credit Agreement § 4.9, Ex. B to Servidea Aff.), and that Woodfill was limited to an annual compensation of $400,000 (Credit Agreement § 6.9, Ex. B to Servidea Aff.).   Instead, upon information and belief, Woodfill withdrew large sums of money from Woodfill Firm and used such funds to make contributions to religious organizations.   Upon information and belief, in 2007, Woodfill donated approximately $370,000 to Lakewood Church, the independent mega-church pastored by Joel Osteen.   Upon information and belief, the same year, Woodfill also donated approximately $385,000 to The Woodlands Christian Center, another Texas church pastored by Matt and Tammy Woodfill.   Notably, Matt and Tammy Woodfill are relatives of Woodfill and were members of Woodfill's steering committee for the campaign to re-elect Woodfill as Harris County Republican Party Chairman.   Then, upon information and belief, from 2008 through 2010, Woodfill donated over $100,000 to The Woodlands Christian Center.   Such payments violate the terms of the Credit Agreement and the priority of payment established in the Security Agreement.

As of February 29, 2012, the outstanding amount of the loan was $29,264,564, consisting of an acknowledged outstanding indebtedness of $20,404,990.47, additional principal advances of $175,000, and accrued interest and fees of $8,684,574.   (*See* Servidea Aff. ¶ 19; Ex. V to Servidea Aff.)   In addition, Defendants are liable to LFR for other pre- and post-judgment interest, costs, and expenses, including attorneys' fees.   (*See* Amended Note § C(2), Credit Agreement § 8.1, Woodfill Guaranty § 2.01, Exs. U, B, and D to Servidea Aff., respectively.)

**C.  The Transfer to LFR of All Right, Title, and Interest to the Woodfill Assets**

As set forth in the accompanying Affidavit of Kathleen M. Servidea, dated March 22,

2012, LFR holds all right, title, and interest in and to the Amended Note, the Forbearance Agreement, and the Woodfill Guaranty (collectively, the "Woodfill Assets"). These rights were held by a few entities before being transferred to LFR. (Servidea Aff. ¶ 20.)

First, in March 2006, the Lender extended credit to Woodfill Firm. (Servidea Aff. ¶ 21.) As part of the loan arrangement, the Lender was granted a continuing security interest in all of Woodfill Firm's personal property, fixtures, and interests, and Woodfill, the sole principal of Woodfill Firm, executed an absolute and unconditional personal guarantee with respect to the credit extended. The Lender then sold participation interests in the Woodfill Assets to two affiliated funds (collectively, the "Stillwater Funds"). (*Id.*)

On or around July 27, 2009, the Lender and the Stillwater Funds transferred the Woodfill Assets to Stillwater Funding, LLC (the "Issuer"), a special purpose vehicle, as part of a securitization of certain of the Lender's payment intangibles. (Servidea Aff. ¶ 22.) The Issuer pledged all of its assets, including the Woodfill Assets, to Wilmington Trust Company, as the indenture trustee (the "Indenture Trustee"), to secure the payment on a note, which was purchased by Partner Reinsurance Company Ltd. ("PartnerRe"). (*Id.*) Pursuant to the securitization, all right, title, and interest in and to the Woodfill Assets were transferred to the Issuer, and the Issuer granted a security interest in the Woodfill Assets to the Indenture Trustee for the benefit of certain secured parties, including PartnerRe as noteholder. (*Id.*)

The Issuer eventually defaulted on the note issued to PartnerRe, and PartnerRe instructed the Indenture Trustee to foreclose on the Issuer's assets. (Servidea Aff. ¶ 23.) Pursuant to a Consent Foreclosure and Sale Agreement, dated as of June 17, 2011, the Issuer transferred the Woodfill Assets to PartnerRe, and LFR, a subsidiary of an affiliate of PartnerRe, acquired the Woodfill Assets. (*Id.*) Thus, LFR holds all right, title, and interest in and to the Woodfill Assets.

## ARGUMENT

I. **LFR IS ENTITLED TO SUMMARY JUDGMENT IN LIEU OF COMPLAINT TO ENFORCE THE AMENDED NOTE, THE FORBEARANCE AGREEMENT, AND THE WOODFILL GUARANTY**

    A. APPLICABLE LEGAL STANDARD

A party moving for summary judgment is required to make a prima facie showing that it is entitled to judgment as a matter of law by providing sufficient evidence to eliminate any material issues of fact from the case.  CPLR 3212(b).  "When an action is based upon an instrument for the payment of money only . . . , the plaintiff may serve with the summons a notice of motion of summary judgment and the supporting papers in lieu of a complaint."  CPLR 3213.  A plaintiff makes a prima facie case for summary judgment in lieu of complaint by (1) proof of an instrument and (2) the defendant's failure to make payment according to its terms.  *Seaman-Andwall Corp. v. Wright Machine Corp.*, 31 A.D.2d 136, 137 (1st Dep't 1968), *aff'd*, 29 N.Y.2d 617 (1971).  Here, the Amended Note, the Forbearance Agreement, and the Woodfill Guaranty are, independently and collectively, an "instrument for the payment of money only" under CPLR 3213.[1]

    B. THE AMENDED NOTE

The Amended Note provides that Woodfill Firm must repay the outstanding principal amount of the loan plus all interest and fees by the Maturity Date.  (Amended Note § A, Ex. U to Servidea Aff.)  By executing the Amended Note, Woodfill Firm made an unconditional promise to repay the loan.  However, despite numerous notices and attempts to negotiate resolution, Woodfill Firm failed to repay the loan and accumulated interest owed under the Amended Note by the Maturity Date.  (*See* Servidea Aff. ¶ 16.)  As such, LFR has established a prima facie right

---

[1]    Pursuant to CPLR 3212(e) and 5012, a court is authorized to grant summary judgment as to any one or more causes of action or part thereof and to proceed separately on the balance.

to recovery with proof of Woodfill Firm's execution of the Amended Note and default in payment. *See Wachovia Bank, N.A. v. Silverman*, 84 A.D.3d 611, 612 (1st Dep't 2011) ("Plaintiff established its entitlement to judgment as a matter of law by producing the promissory note allegedly executed by defendants and demonstrating that defendants failed to pay." (citing *Solomon v. Langer*, 66 A.D.3d 508, 508 (1st Dep't 2009))); *Takeuchi v. Silberman*, 41 A.D.3d 336, 336-37 (1st Dep't 2007) ("Plaintiffs established a prima facie right to recovery with proof of defendant's execution of the [promissory] notes and default in payment . . ." (citing *Alard, L.L.C. v. Weiss*, 1 A.D.3d 131, 131 (1st Dep't 2003))); *Shearson Lehman Hutton, Inc. v. Myerson & Kuhn*, 197 A.D.2d 410, 410-11 (1st Dep't 1993) (holding that a note is an instrument for the payment of money only). Thus, LFR has established its entitlement to summary judgment in lieu of complaint on the Amended Note.

### C.   THE FORBEARANCE AGREEMENT

As set forth above, the Forbearance Agreement (i) specifies the precise maximum principal amount of the loan ($20,655,000), (ii) provides the term of the loan, ending on the Maturity Date (September 30, 2010), (iii) provides that Woodfill Firm must repay the outstanding principal amount of the loan, plus all interest and fees by the Maturity Date, and (iv) defines an "Event of Default" as the failure to repay the principal, interest, fees, or any other sums due under the Amended Credit Agreement. (*See* Credit Agreement § 7.1, Ex. B to Servidea Aff.) Importantly, the Forbearance Agreement provides an unconditional promise to repay the principal of the loan and all accrued interest by the Maturity Date and, therefore, constitutes an "instrument for the payment of money only" under CPLR 3213. *See Warburg, Pincus Equity Partners, L.P. v. Keane*, 22 A.D.3d 321, 321 (1st Dep't 2005) (affirming granting of summary judgment in lieu of complaint based on defendant's failure to pay on loan

agreements that contained an unequivocal and unconditional promise to repay); *Brest v. Kleidman*, 300 A.D.2d 133 (1st Dep't 2002) (affirming summary judgment in lieu of complaint granted on loan agreement); *Mangiatordi v. Maher*, 293 A.D.2d 454 (2d Dep't 2002) (reversing and granting summary judgment in lieu of complaint based on letter agreement evidencing a loan); *AFCO Credit Corp. v. Eshaghian*, 217 A.D.2d 676 (2d Dep't 1995) (granting motion for summary judgment in lieu of complaint based on financing agreement).   Furthermore, as a condition of the Forbearance Agreement, Woodfill agreed to duly and punctually perform all of its obligations, including repayment of the loan commitment of $20,655,000 by the Maturity Date of September 30, 2010. (*See* Forbearance Agreement  § 4-5, Ex. T to Servidea Aff.)  The Forbearance Agreement also includes Woodfill's acknowledgment of $20,404,990.47 in debt and Woodfill's release of the Lender and its successors from all losses, claims, actions, and causes of action. (*See* Forbearance Agreement §§ 5, 8; Ex. T to Servidea Aff.)

By establishing Woodfill Firm's failure to repay the loan and accumulated interest owed under the Amended Credit Agreement, LFR has established a prima facie case of its right to repayment under the Amended Credit Agreement and is entitled to summary judgment.  *See Warburg, Pincus Equity Partners*, 22 A.D.3d at 321; *Brest*, 300 A.D.2d at 133; *Cantrade Privatbank AG Zurich v. Bangkok Bank Pub. Co.*, 256 A.D.2d 11, 12 (1st Dep't 1998) (affirming granting of summary judgment in lieu of complaint citing letter of credit as establishing plaintiff's prima facie case for accelerated judgment).

### D.    THE WOODFILL GUARANTY

Likewise, it is well settled in New York that the Woodfill Guaranty qualifies as an instrument for the payment of money only.  *See Bank of America, N.A. v. Solow*, 59 A.D.3d 304, 304 (1st Dep't 2009); *Jason Trading Corp. v. Lason Trading Corp.*, 303 A.D.2d 180, 180 (1st

Dep't 2003); *Chase Manhattan Bank, N.A. v. Marcovitz*, 56 A.D.2d 763 (1st Dep't 1977) (noting that the a guarantee is "an instrument for the payment of money only within the meaning of CPLR 3213" (citing *Rhodia, Inc. v. Steel*, 32 A.D.2d 753, 753 (1st Dep't 1969))). Under the Woodfill Guaranty, Woodfill explicitly acknowledged an indebtedness and the duty to make payment on such indebtedness. *See Valencia Sportswear, Inc. v. D.S.G. Enters., Inc.*, 237 A.D.2d 171, 171 (1st Dep't 1997) ("Both the loan agreement and the guarantee are clearly instruments for the payment for money only qualifying for CPLR 3213 treatment, since no proof outside the face of the documents themselves, other than of non-payment, is needed to prove a prima facie case."); *Milliken & Co. v. Stewart*, 182 A.D.2d 385, 386-87 (1st Dep't 1992) ("Where a guarantee states that it is primary and unconditional and binds the guarantor to pay immediately upon the default of the debtor, it is considered to be a guarantee of payment, and upon default the creditor may proceed directly against the guarantor in the first instance." (internal citations omitted)); *European Am. Bank & Trust Co. v. Schirripa*, 108 A.D.2d 684, 684 (1st Dep't 1985) (holding that submitting a guaranty along with an affidavit of non-payment is sufficient support for a motion for summary judgment in lieu of complaint); *Rhodia, Inc.*, 32 A.D.2d at 753 ("The unconditional guarantee is an instrument for the payment of money only within the meaning of CPLR 3213.").

Woodfill failed to fulfill his obligations of payment under the Woodfill Guaranty. (*See* Servidea Aff. ¶ 17.) Accordingly, LFR has established, as a matter of law, its right to repayment under the Woodfill Guaranty. *See Boland v. Indah Kiat Fin. (IV) Mauritius Ltd.*, 291 A.D.2d 342, 343 (1st Dep't 2002) ("Plaintiff established a prima facie case of its right to payment, as required, 'by proof of the note and a failure to make the payments called for by its terms.'" (quoting *Seaman-Andwall Corp.*, 31 A.D.2d at 137)); *Chem. Bank v. Nemeroff*, 233 A.D.2d 239,

239 (1st Dep't 1996) ("As the guaranty in question is an instrument for the payment of money only, and since there is no dispute that there has been a default in payment of the corresponding loan, the guaranty was properly enforced pursuant to CPLR 3213." (citing *Seaman-Andwall Corp.*, 31 A.D.2d at 137)).

### E.   COSTS, EXPENSES, AND ATTORNEYS' FEES

Moreover, LFR also seeks recovery for the costs and expenses of collection, including reasonable attorneys' fees and court costs.  The Amended Note, the Credit Agreement, and the Woodfill Guaranty provide for the payment of these costs and expenses.  (*See* Exs. U, B, and D to Servidea Aff., respectively.)  Contractual provisions allowing for the recovery of costs and expenses of collection, including reasonable attorneys' fees, are routinely enforced by New York courts.  *See Int'l Bus. Mach. Corp. v. Murphy & O'Connell*, 183 A.D.2d 681, 682 (1st Dep't 1992); *Chase Manhattan Bank*, 56 A.D.2d at 763.  Thus, Defendants are also liable for LFR's costs and expenses of collection, including its reasonable attorneys' fees.

## CONCLUSION

For the reasons stated herein, LFR respectfully requests that this Court grant it summary judgment against Defendants, jointly and severally, in the amount of $29,264,564 in outstanding principal and accrued interest and fees, plus pre- and post-judgment interest, attorneys' fees and collection costs, and grant such further relief that this Court may deem just and proper.

Dated:      March 26, 2012
            New York, New York

                              Respectfully submitted,

                              MAYER BROWN LLP

                              By: _Joseph DeSimone_____
                                  Joseph De Simone
                                  Lawrence M. Barnes
                                  Mary M. Makary

                              1675 Broadway
                              New York, NY 10019
                              Telephone (212) 506-2500

                              *Attorneys for Plaintiff LFR Collections LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - X

LFR COLLECTIONS LLC,                              :

                Plaintiff,       :

                            :       Index No. 650934/2012

      - against –                         :

                            :       **NOTICE OF MOTION FOR**

WOODFILL & PRESSLER, L.L.P. and                  :       **SUMMARY JUDGMENT**

JARED R. WOODFILL V,                              :       **IN LIEU OF COMPLAINT**

                Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - X

    **PLEASE TAKE NOTICE** that upon the Summons dated March 23, 2012, the annexed

Affidavit of Kathleen M. Servidea sworn to on March 22, 2012, including the exhibits attached

thereto, and the memorandum of law in support of its motion for summary judgment in lieu of

complaint pursuant to CPLR 3213, Plaintiff LFR Collections LLC ("LFR") will move this Court

at the Motion Support Office, Room 130, at the Courthouse located at 60 Centre Street, New

York, New York, on  May 11, 2012, at 9:30 a.m., or as soon thereafter as counsel can be heard,

for an order directing the entry of judgment for LFR and against the Defendants, jointly and

severally, in the outstanding amount of $29,264,564 (consisting of an acknowledged outstanding

indebtedness of $20,404,990.47, additional principal advances of $175,000, and accrued interest

and fees of $8,684,574, as of February 29, 2012), plus pre- and post-judgment interest, and all

costs and expenses, including attorneys' fees and costs, incurred by LFR in connection with

bringing this action, and for such other and further relief as this Court may deem just and proper,

upon the ground that this is an action based upon an instrument for the payment of money only

and that no triable issue of fact exists.

**PLEASE TAKE NOTICE** that, pursuant to CPLR 3213, all answering papers shall be served upon the undersigned at least ten days prior to the return date of this motion.

Dated:          March 26, 2012
                New York, New York

                                    Respectfully submitted,

                                    MAYER BROWN LLP

                                    By: _____
                                        Joseph De Simone
                                        Lawrence M. Barnes
                                        Mary M. Makary

                                    1675 Broadway
                                    New York, NY 10019
                                    Telephone (212) 506-2500

                                    *Attorneys for Plaintiff LFR Collections LLC*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – X

LFR COLLECTIONS LLC,                          :

                Plaintiff,               :

                         :    Index No. 650934/2012

      – against –                       :

WOODFILL & PRESSLER, L.L.P. and              :    **AFFIDAVIT OF**
JARED R. WOODFILL V,                          :    **KATHLEEN M. SERVIDEA**

              Defendants.             :

– – – – – – – – – – – – – – – – – – – – – – X

STATE OF CONNECTICUT    )
                       ) SS:
COUNTY OF FAIRFIELD     )

       Kathleen M. Servidea, being duly sworn, deposes and says that:

       I am Associate General Counsel and Secretary at LFR Collections LLC ("LFR").  This

Affidavit is based upon my personal knowledge of the facts set forth herein, my review of

business records prepared and maintained by LFR in the ordinary course of business, and the

documents filed in this matter.  I submit this Affidavit in support of LFR's Motion for Summary

Judgment in Lieu of Complaint.

## I.    <u>THE LOAN AND THE DEFAULT</u>

       1.     Gerova Asset Backed Holdings, LP f/k/a The Stillwater Asset Backed Fund, LP

d/b/a The Stillwater Asset-Backed Fund LP (the "Lender") issued a $5,000,000.00 Revolving

Credit Note, dated March 1, 2006 (the "Note") to Woodfill & Pressler, L.L.P. ("Woodfill Firm")

to fund, in part, the working capital needs of the firm (the "Woodfill Loan").  A true and correct

copy of the Note is attached hereto as Exhibit A.

       2.     A Credit Agreement, dated March 1, 2006 (the "Credit Agreement"), was

executed in connection with the Woodfill Loan.   A true and correct copy of the Credit Agreement is attached hereto as Exhibit B.

3.      A Security Agreement, dated March 1, 2006 (the "Security Agreement"), was also executed, granting the Lender a continuing security interest in all of Woodfill Firm's personal property, fixtures, and interests.   Security Agreement § 2.   A true and correct copy of the Security Agreement is attached hereto as Exhibit C.

4.      As a condition to the Woodfill Loan, Jared R. Woodfill V ("Woodfill") executed an absolute, unconditional, and irrevocable personal guaranty of the Woodfill Loan (the "Woodfill Guaranty").   A true and correct copy of the Woodfill Guaranty is attached hereto as Exhibit D.

5.      Woodfill also executed a Pledge Agreement, dated March 1, 2006 (the "Pledge Agreement"), granting the Lender a continuing security interest in Woodfill's collateral.   Pledge Agreement § 2.   A true and correct copy of the Pledge Agreement is attached hereto as Exhibit E.

6.      As Woodfill Firm drew down its credit line, Woodfill Firm executed amendments to the Note.   A true and correct copy of the Amended and Restated Revolving Credit Note, dated December 18, 2006, is attached hereto as Exhibit F.   A true and correct copy of the Second Amended and Restated Revolving Credit Note, dated December 21, 2007, is attached hereto as Exhibit G.   A true and correct copy of the Third Amended and Restated Revolving Credit Note, dated March 10, 2009, is attached hereto as Exhibit H.   A true and correct copy of the Fourth Amended and Restated Revolving Credit Note, dated June 30, 2009, is attached hereto as Exhibit I.

7.      In connection with the amendments to the Note, Woodfill Firm executed amendments to the Credit Agreement.   A true and correct copy of the Amendment No. 1 to the

Credit Agreement, dated December 10, 2006, is attached hereto as Exhibit J. A true and correct copy of Amendment No. 2 to Credit Agreement, dated December 21, 2007, is attached hereto as Exhibit K. A true and correct copy of the Amendment No. 3 to the Credit Agreement, dated March 10, 2009, is attached hereto as Exhibit L. A true and correct copy of the Amendment No. 4 to the Credit Agreement, dated June 30, 2009, is attached hereto as Exhibit M.

8.     In connection with the amendments to the Note and the Credit Agreement, Woodfill executed confirmations of the Woodfill Guaranty. A true and correct copy of the Confirmation of Guaranty, dated December 18, 2006, is attached hereto as Exhibit N. A true and correct copy of the Confirmation of Guaranty, dated December 21, 2007, is attached hereto as Exhibit O. A true and correct copy of the Confirmation of Guaranty, dated March 10, 2009, is attached hereto as Exhibit P. A true and correct copy of the Confirmation of Guaranty, dated June 30, 2009, is attached hereto as Exhibit Q.

9.     As Woodfill Firm drew down its credit line, Woodfill executed confirmations of its loan. Attached hereto as Exhibit R is a true and correct copy of Woodfill Firm's confirmation of its loan, dated June 11, 2009, which provided that, as of May 31, 2009: (1) the total loan commitment was $15,000,000; (2) the amount outstanding was $15,573,829.19; (3) the interest rate was 18.25%; (4) the Maturity Date was  June 30, 2009; and (5) the interest outstanding was $244,336.09.

10.     Attached hereto as Exhibit S is a true and correct copy of Woodfill Firm's confirmation of its loan, dated February 26, 2010, which provided that, as of December 31, 2009: (1) the principal amount unpaid was $18,504,813.61; (2) the interest rate was 18%; and (3) the Maturity Date was September 30, 2009.

11.     On May 17, 2010, the Credit Agreement was amended for the fifth and final time

in the Forbearance Agreement and Amendment (collectively with the Credit Agreement as amended, the "Forbearance Agreement"), which described Woodfill Firm's and Woodfill's default under the Credit Agreement and the Woodfill Guaranty, respectively. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit T.

12.     By executing the Forbearance Agreement, Woodfill Firm and Woodfill acknowledged an indebtedness totaling $20,404,990.47 and amended the Credit Agreement, increasing the maximum principal amount to $20,655,000 and extending the Maturity Date to September 30, 2010. Forbearance Agreement §§ 2, 5. The Forbearance Agreement also confirms Woodfill's obligations under the Woodfill Guaranty. Forbearance Agreement § 6.

13.     In connection with the Forbearance Agreement, the Lender issued a Fifth Amended and Restated Revolving Credit Note in the maximum principal amount of $20,655,000 ("Amended Note") to Woodfill Firm. A true and correct copy of the Amended Note is attached hereto as Exhibit U.

14.     Attached hereto as Exhibit V is a true and correct copy of the loan history for the Woodfill Loan (the "Loan History"), pursuant to the Forbearance Agreement and the Amended Note.

15.     Following the securitization of the Woodfill Assets (*see supra* Part II.B), Wilmington Trust Company, as indenture trustee, maintained activity detail statements for Stillwater Funding, LLC that provide the foundation for the entries on the Loan History. Attached here to as Exhibit W is a true and correct copy of Wilmington Trust's activity detail statements, redacted to exclude transactions unrelated to Defendants.

16.     Woodfill Firm did not repay the principal and unpaid interest, fees, and expenses owed under the Amended Note and the Forbearance Agreement upon the Maturity Date of

September 30, 2010.  *See* Ex. V.

17.     Woodfill did not repay the principal and unpaid interest, fees, and expenses owed under the Woodfill Guaranty upon the Maturity Date of September 30, 2010.  *See* Ex. V.

18.     Attached hereto as Exhibit X is a true and correct copy of the Notice of Default and Demand for Repayment, dated December 2, 2010.

19.     As of February 29, 2012, the outstanding amount of the loan was $29,264,564, consisting of an acknowledged outstanding indebtedness of $20,404,990.47, additional principal advances of $175,000, and accrued interest and fees of $8,684,574.  Ex. V.

## II.    TRANSFER OF THE LENDER'S RECEIVABLES TO LFR

### OVERVIEW

20.     LFR holds all right, title, and interest in and to the Amended Note, the Forbearance Agreement, the Security Agreement, the Woodfill Guaranty, and the Pledge Agreement.  This includes: (1) the cash flows generated by the Woodfill Loan ("Woodfill Receivables"); (2) the security interest in Woodfill Firm's assets ("Woodfill Security Interest"); and (3) the Woodfill Guaranty and accompanying security interest in Woodfill's collateral as defined in the Pledge Agreement.  Together, the Woodfill Receivables, the Woodfill Security Interest, and the Woodfill Guaranty shall be referred to as the "Woodfill Assets."  These rights passed through a few entities before being acquired by LFR.

21.     First, in March 2006, the Lender extended credit to Woodfill Firm.  As part of the loan arrangement, the Lender was granted a continuing security interest in all of Woodfill Firm's personal property, fixtures, and interests, and the principal of Woodfill Firm executed an absolute and unconditional personal guaranty with respect to credit extended.  The Lender then sold participation interests in the Woodfill Assets to two affiliated funds (the "Stillwater Funds").

- 5 -

22.     Next, on or around July 27, 2009, the Lender and the Stillwater Funds transferred the Woodfill Assets to Stillwater Funding, LLC (the "Issuer"), a special purpose vehicle, as part of a securitization of certain of the Lender's payment intangibles.  The Issuer pledged all of its assets, including the Woodfill Assets, to Wilmington Trust Company, as the indenture trustee (the "Indenture Trustee"), to secure the payment on a note, which was purchased by Partner Reinsurance Company Ltd. ("PartnerRe").  Pursuant to the securitization, all right, title, and interest in and to the Woodfill Assets were transferred to the Issuer, and the Issuer granted a security interest in the Woodfill Assets to the Indenture Trustee, for the benefit of certain secured parties, including PartnerRe as noteholder.

23.     Finally, the Issuer eventually defaulted on the note issued to PartnerRe, and PartnerRe instructed the Indenture Trustee to foreclose on the Issuer's assets.  Pursuant to a Consent Foreclosure and Sale Agreement, dated as of June 17, 2011, the Issuer transferred the Woodfill Assets to PartnerRe.  Subsequently, LFR, a subsidiary of an affiliate of PartnerRe, acquired the Woodfill Assets.  Thus, LFR holds all right, title, and interest in and to the Woodfill Assets.

### A.     THE LENDER EXTENDS CREDIT TO DEFENDANTS

24.     As set forth above, beginning on or about March 1, 2006, the Lender extended a credit line to Woodfill Firm, pursuant to the Note, the Credit Agreement, the Security Agreement, and the Woodfill Guaranty.

25.     Under the Credit Agreement, the Lender can assign all or part of its rights to the Woodfill Assets.  Specifically, Section 8.7 of the Credit Agreement states that the "Lender may at any time assign all, or a part of its rights and obligations under this Agreement and the other Financing Agreements."  Ex. B, Credit Agreement § 8.7.  The Credit Agreement defines

"Financing Agreements" as "(i) this [Credit] Agreement, (ii) the Security Agreement, (iii) the Revolving Credit Note, (iv) the [Woodfill] Guaranty, (v) the Pledge Agreement and (vi) any other supplemental security agreements or other collateral documents now or hereafter delivered to the Lender by the Borrower or the Guarantor." Ex. B, Credit Agreement § 1.1. This definition also includes any amendments, modifications, or supplements to the above documents. *Id.*

26.     The Lender sold participation interests in the Woodfill Loan to two related funds, Stillwater Asset Backed Fund II, LP and Stillwater Asset Backed Offshore Fund, Ltd. Each fund, through its participation interests, purchased a certain percentage of the Woodfill Assets.

27.     As Woodfill Firm drew down its credit line, the Lender sold participation interests in some of those draws to Stillwater Asset Back Fund II, LP. In the aggregate, this fund purchased an approximate 30% participation interest in the Woodfill Loan, which resulted in an approximate 30% interest in the Woodfill Assets. *See* Ex. AA, PA I, Schedule I.

28.     In addition, as Woodfill Firm drew down on its credit line, the Lender sold participation interests in some of those draws to Stillwater Asset Backed Offshore Fund, Ltd. In the aggregate, this fund purchased an approximate 70% participation interest in the Woodfill Loan, which resulted in an approximate 70% interest in the Woodfill Assets. *See* Ex. BB, PA II, Schedule I.

29.     At the end of the sale of all the participation interests, the Lender had sold a 100% participation interest in the Woodfill Assets.

### B.     THE SECURITIZATION OF THE LOAN

30.     On or around July 27, 2009, the Woodfill Assets were securitized. As part of that securitization, the Issuer, a special purpose vehicle, was created to purchase a large pool of

payment intangibles generated by the Lender's loans to several borrowers, including Woodfill Firm. The Issuer raised capital to purchase the payment intangibles by issuing a note, secured by all of the Issuer's assets, including the Woodfill Assets, to PartnerRe. The Woodfill Assets were purchased by the Issuer as part of the securitization.

### (i)    THE LENDER TRANSFER

31.    To securitize the payment intangibles, the Lender and the Issuer entered into a Receivables Purchase Agreement, dated as of July 27, 2009 ("RPA"). A true and correct copy of the RPA is attached hereto as Exhibit Y.

32.    Specifically, Section 2.1 of the RPA transfers and assigns all of the Lender's "rights, title and interest in, to and under the Receivables in each Account and all Collateral Security . . . " Ex. Y, RPA § 2.1.

33.    The terms "Collateral Security", "Account" and "Receivables" are defined in the Indenture, dated as of July 27, 2009 ("Indenture"), and its definitions incorporated in the RPA. Ex. Y, RPA § 1.1(a). A true and correct copy of the Indenture is attached hereto as Exhibit Z.

34.    The Indenture defines "Collateral Security" as "with respect to any Receivable, (i) the security interest granted by or on behalf of the applicable Law Firm or any other Person to secure payment of such Receivables, (ii) all other security interest of Liens and property subject thereto from time to time purporting to secure payment of such Receivable or otherwise, together with all financing statements filed against a Law Firm describing any collateral securing such Receivable, and (iii) any personal or corporate guaranty covering all or any portion of such Receivable." Ex. Z, Indenture § 1.1.

35.    The Indenture defines "Accounts" as "each financing account or line of credit established by [Lender] with a Law Firm . . . which list is attached to [the] Receivables Purchase

Agreement as Schedule I." Ex. Z, Indenture § 1.1.  Schedule I to the RPA lists Woodfill Firm as

an Account.  Ex. Y, RPA Schedule I.

36.     The Indenture defines "Receivables" as "with respect to an Account, all amounts

payable by the applicable Law Firm from time to time in respect of advances made by any Seller

to such Law Firm, together with the group of writings evidencing such amounts and the security

interest created in connection therewith."  Ex. Z, Indenture § 1.1.

37.     Regarding Woodfill Firm, Schedule I of the RPA notes that the Receivables owed

to the Lender from Woodfill Firm is zero.  Ex. Y, RPA Schedule I.  This is because the Lender

had already transferred a 100% participation interest in the Woodfill Assets to the Stillwater

Funds.  Notwithstanding the transfer of participations interests to the Stillwater Funds, the RPA

transfers and assigns any remaining rights and interests of the Lender in the Woodfill Assets to

the Issuer.

        (ii)    THE STILLWATER FUNDS' TRANSFER

38.     The Stillwater Funds transferred their 100% participation interest in the Woodfill

Assets to the Issuer.

39.     Stillwater Asset Backed Fund II, LP and the Issuer entered into a Purchase

Agreement, dated as of July 27, 2009 ("PA I") and transferred all of Stillwater Asset Backed

Fund II, LP's interest in the Woodfill Assets to the Issuer.  A true and correct copy of PA I is

attached hereto as Exhibit AA.

40.     Section 2.1 of PA I states that Stillwater Asset Backed Fund II, LP "does hereby

sell, transfer, assign . . . all of its right, title, and interest in, to and under . . . as a participant, in

the Receivables in each Account and all Collateral Security" to the Issuer.  PA I incorporates the

definitions in the Indenture.  Ex. AA, PA I § 1.1.  Stillwater Asset Backed Fund II, LP

represented that Schedule I attached to PA I was "an accurate and complete listing in all material respects" of Stillwater Asset Backed Fund II, LP's receivables. Ex. AA, PA I § 3.1(cc). Schedule I shows that Stillwater Asset Backed Fund II, LP held a 30% interest in the Woodfill Assets.

41.     Stillwater Asset Backed Offshore Fund, Ltd. transferred all of its interest in the Woodfill Assets to Stillwater AB Offshore Funding, Ltd., which subsequently transferred them to the Issuer. Specifically, Stillwater Asset Backed Offshore Fund, Ltd. and Stillwater AB Offshore Funding, Ltd. entered into a Purchase Agreement, dated as of July 27, 2009 ("PA II"). A true and correct copy of PA II is attached hereto as Exhibit BB.

42.     Section 2.1 of PA II states that Stillwater Asset Backed Offshore Fund, Ltd. "does hereby sell, transfer, assign . . . all of its right, title, and interest in, to and under . . . as a participant, in the Receivables in each Account and all Collateral Security" to Stillwater AB Offshore Funding, Ltd. PA II incorporates the definitions in the Indenture. Ex. BB, PA II § 1.1. Stillwater Asset Backed Offshore Fund, Ltd. represented that Schedule I attached to PA II was "an accurate and complete listing in all material respects" of Stillwater Asset Backed Offshore Fund, Ltd.'s receivables. Ex. BB, PA II § 3.1(cc). Schedule I shows that Stillwater Asset Backed Offshore Fund, Ltd. held a 70% interest in the Woodfill Assets.

43.     Stillwater AB Offshore Funding, Ltd. then immediately executed a Purchase Agreement, dated as of July 27, 2009 ("PA III"), with the Issuer and transferred its 70% interest in the Woodfill Assets to the Issuer. A true and correct copy of PA III is attached hereto as Exhibit CC. The transfer provisions in PA III are identical to the transfer provisions in the previous two purchase agreements (PA I and PA II).

44.     At the close of the securitization, the Issuer held an approximate 100% interest in

- 10 -

the Woodfill Assets, which it had purchased from the Lender and the Stillwater Funds.

### (iii)   THE ISSUER ISSUES A NOTE TO PARTNERRE

45.     Pursuant to the Indenture, the Issuer granted a security interest in all of its assets
to the Indenture Trustee, for the benefit of certain secured parties, including any noteholders of
the Issuer.  Ex. Z, Indenture, Granting Clause.  PartnerRe purchased a note (the "PartnerRe
Note") issued by the Issuer pursuant a Note Purchase Agreement, dated as of July 27, 2009 (the
"Note Purchase Agreement").  A true and correct copy of the Note Purchase Agreement is
attached hereto as Exhibit DD.  The accompanying Indenture gave the Indenture Trustee, acting
at the direction of PartnerRe as sole noteholder of the Issuer, the right to foreclose on the Issuer's
assets upon an event of default ("Event of Default"), which included nonpayment of interest or
principal on the PartnerRe Note.  Ex. Y, Indenture §§ 5.1(a-c), 5.2, and 5.4.

### C.   THE WOODFILL ASSETS ARE TRANSFERRED TO LFR

46.     Subsequently, the Issuer defaulted on the PartnerRe Note, and PartnerRe
instructed the Indenture Trustee to foreclose on the Issuer's assets.  Shortly thereafter, the Issuer
executed the Consent Foreclosure and Sale Agreement, dated as of June 17, 2011 (the
"Foreclosure Agreement").  A true and correct copy of the Foreclosure Agreement is attached
hereto as Exhibit EE.

47.     Under the Foreclosure Agreement, the Issuer agreed "to sell, surrender, convey,
transfer and assign all of its right, title and interest in and to the Collateral . . . to the Noteholder."
Ex. EE, Foreclosure Agreement § 2.1.  PartnerRe is defined in the Foreclosure Agreement as the
Noteholder.  The Foreclosure Agreement defines "Collateral" to include, among other things, the
Conveyed Receivables and the assets listed in Exhibit A to the Foreclosure Agreement.  Ex. EE,
Foreclosure Agreement, Recitals at C.   Exhibit A to the Foreclosure Agreement defines

Collateral and Conveyed Receivables to include "Receivables", which are "all amounts payable by the applicable Law Firm, which such amounts as of June 17, 2011 are listed on Schedule 2 . . . " Ex. EE, Foreclosure Agreement, Schedule 2.  Schedule 2 lists the Woodfill Receivables.

48.     In addition, "Collateral" is defined by Exhibit A to the Foreclosure Agreement as "all Collateral Security," which "means with respect to any Receivable, (i) the security interest granted by or on behalf of the applicable Law Firm or any other Person to secure payment of such Receivables, (ii) all other security interest of Liens and property subject thereto from time to time purporting to secure payment of such Receivable or otherwise, together with all financing statements filed against a Law Firm describing any collateral securing such Receivable, and (iii) any personal or corporate guaranty covering all or any portion of such Receivable."  Ex. EE, Foreclosure Agreement, Exhibit A, Schedule 1.   This would include the Woodfill Security Interest and Woodfill Guaranty.

49.     In addition to the Foreclosure Agreement, the Issuer also executed a General Warranty Bill of Sale, dated July 12, 2011, in favor of PartnerRe ("Bill of Sale").   A true and correct copy of the Bill of Sale is attached hereto as Exhibit FF.   In the Bill of Sale, the Issuer transferred to PartnerRe all of its "right, title, and interest in and to all assets and property of [the Issuer]."

50.     In sum, the Foreclosure Agreement and Bill of Sale transferred from the Issuer to PartnerRe all right, title, and interest in and to the Woodfill Assets.

51.     PartnerRe then transferred the Woodfill Assets to PartnerRe Capital Investment Corp. ("PCIC") pursuant to a Board Resolution, dated June 23, 2011 ("PartnerRe Resolution"). A true and correct copy of the PartnerRe Resolution is attached hereto as Exhibit GG.

52.     PCIC then transferred the assets to LFR, a wholly own subsidiary, pursuant to a

- 12 -

Board Resolution, dated June 27, 2011 ("PCIC Resolution").  A true and correct copy of the PCIC Resolution is attached hereto as Exhibit HH.

53.    LFR accepted receipt of the assets pursuant to a Board Resolution, dated June 30, 2011 ("LFR Resolution").  A true and correct copy of the LFR Resolution is attached hereto as Exhibit II.

56.     LFR now holds all right, title, and interest in and to the (1) Woodfill Receivables;

(2) Woodfill Security Interest, and (3) Woodfill Guaranty.

_____
Kathleen M. Servidea

Sworn to before me this
22nd day of March, 2012

_____
Notary Public

TRACEY A BERRY
Notary Public
Connecticut
My Commission Expires Jan 31, 2013

- 14 -

# EXHIBIT A

# REVOLVING CREDIT NOTE

$5,000,000                                                                          New York, New York
                                                                                       March 1, 2006

A.        GENERAL; TERMS OF PAYMENT

        FOR VALUE RECEIVED, the undersigned, WOODFILL & PRESSLER, L.L.P., a Texas limited liability partnership (the "Borrower"), promises to pay to the order of THE STILLWATER ASSET-BACKED FUND LP, a Delaware limited partnership (the "Lender"), at its office at 41 Madison Avenue, New York, New York 10010, or at such other place as may be designated by the holder hereof in writing, the principal sum of FIVE MILLION DOLLARS ($5,000,000.00) or, if less, the aggregate unpaid principal sum of all Loans made by the Lender to the Borrower from time to time pursuant to a credit agreement, dated the date hereof, between the Borrower and the Lender (the "Credit Agreement"), on March 1, 2008.

        The Lender is hereby authorized to enter on the schedule attached hereto the amount of each loan and each payment of principal thereon, without any further authorization on the part of the Borrower or any endorser or guarantor of this Note, but the Lender's failure to make such entry shall not limit or otherwise affect the obligations of the Borrower or any endorser or guarantor of this Note.

        The Borrower will pay interest on the unpaid principal amount of each loan from time to time outstanding, computed on the basis of a 360-day year, at the rates provided in the Credit Agreement but in no event in excess of the maximum rate permitted by law.  Interest on the unpaid principal amount of the Revolving Loans shall be payable the first day of each month in each year, commencing on the first day of the first full calendar month after the date of this Note, at maturity (whether by acceleration or otherwise) and upon the making of any prepayment.  Upon the occurrence and during the continuance of an Event of Default (as defined in the Credit Agreement), the Borrower shall on demand pay interest, to the extent permitted by law, on the unpaid Obligations (as defined in the Credit Agreement) at a rate per annum equal to four (4%) percent in excess of the rate otherwise applicable to such Obligations, but in no event in excess of the maximum rate permitted by applicable law.

        All payments by the Borrower on account of principal, interest or fees hereunder shall be made in lawful money of the United States of America, in immediately available funds.  The Borrower authorizes (but shall not require) the Lender to debit any account maintained by the Borrower, at any date on which a payment is due under this Note, in an amount equal to any unpaid portion of such payment.  If any payment of principal or interest becomes due on a day on which the Lender is closed (as required or permitted by law or otherwise), such payment shall be made not later than the next succeeding business day, and such extension shall be included in computing interest in connection with such payment.

B.        DEFAULT

        Upon the occurrence of an Event of Default, as defined in the Credit Agreement, and during the continuance thereof, the Lender may declare the entire unpaid principal amount of this Note and all interest and fees accrued and unpaid hereon to be forthwith due and payable, whereupon the same shall immediately become and be forthwith due and payable, without present, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower.

C.     MISCELLANEOUS

1.     No Waiver: Rights and Remedies Cumulative.  No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Lender of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies herein provided are cumulative and not exclusive of any remedies or rights provided by law or by any other agreement between the Borrower and the Lender.

2.     Costs and Expenses.  The Borrower shall reimburse the Lender for all costs and expenses incurred by it and shall pay the reasonable fees and disbursements of counsel to the Lender in connection with the enforcement of the Lender's rights hereunder.

3.     Amendments.  No amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective unless the same shall be in writing and signed by the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

4.     Construction.  Except as herein provided, this Note shall be governed by the laws of the State of New York, without giving effect to its choice of law principles.  The Borrower hereby irrevocably consents to the jurisdiction of the Supreme Court of the State of New York for the County of New York, and the United States District Court for the Southern District of New York, in connection with any action or proceeding arising out of or relating to this Note, and the Borrower further irrevocably consents to the service or process in any such action or proceeding by the mailing of a copy of such process to the Borrower at the address set forth below.  In the event of litigation between the Lender and the Borrower over any matter connected with this Note, the right to a trial by jury is hereby waived by the Lender and the Borrower.

5.     Successors and Assigns.   This Note shall be binding upon the Borrower and its successors and assigns and the terms hereof shall inure to the benefit of the Lender and its successors and assigns, including subsequent holders hereof.

6.     Severability.  The provisions of this Note are severable, and if any provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall not in any manner affect such provision in any other jurisdiction or any other provision of this Note in any jurisdiction.

7.     Waiver of Notice; Set-off.  The Borrower hereby waives presentment, demand for payment, notice of protest and all other demands in connection with the delivery, acceptance, performance, default or enforcement of this Note.  The balance of every account of the Borrower with, and each claim of the Borrower against, the Lender existing from time to time shall be subject to a lien and subject to be set-off against any and all liabilities of the Borrower to the Lender, including those hereunder.

2

8.    <u>Credit Agreement</u>.  This Note is the Revolving Credit Note referred to in the Credit Agreement and the holder hereof is entitled to the benefits thereof and of the other Financing Agreements (as defined in the Credit Agreement).

**WOODFILL & PRESSLER, L.L.P.**

By: _____

Name: JARED R. WOODFILL

Title: MANAGING PARTNER

# EXHIBIT B

**CREDIT AGREEMENT**

**BETWEEN**

**WOODFILL & PRESSLER, L.L.P., AS BORROWER**

**AND**

**THE STILLWATER ASSET-BACKED FUND LP, AS LENDER**

**As of March 1, 2006**

{503877;4}

# TABLE OF CONTENTS

Page

SECTION I.   DEFINITIONS .................................................................................1
1.1   Definitions ..........................................................................................1
1.2   Accounting Terms ...............................................................................5
SECTION II.   FINANCING ...................................................................................5
2.1   Loans ...................................................................................................5
2.2   Interest .................................................................................................6
2.3   Payment ...............................................................................................6
2.4   Security and Guarantee .......................................................................8
2.5   Intentionally Omitted ..........................................................................8
2.6   Fees ......................................................................................................8
2.7   Intentionally Omitted ..........................................................................8
2.8   Right To Debit Account .......................................................................9
SECTION III.   CONDITIONS PRECEDENT ........................................................9
3.1   Conditions to the Making of the Loans ...............................................9
3.2   Post Closing Date Preconditions .......................................................10
SECTION IV.   REPRESENTATIONS AND WARRANTIES ..............................10
4.1   Organization. .....................................................................................10
4.2   Authorization .....................................................................................10
4.3   No Conflicts .......................................................................................11
4.4   Compliance and Other Agreements ...................................................11
4.5   ERISA .................................................................................................11
4.6   Approvals and Consents ....................................................................12
4.7   Investment Company .........................................................................12
4.8   Regulation U; Securities Exchange Act of 1934 ..............................12
4.9   Use of Funds ......................................................................................12
4.10   Financial Statements .........................................................................12
4.11   Taxes .................................................................................................12
4.12   Title to Properties/Priority of Liens .................................................13
4.13   Litigation ..........................................................................................13
4.14   Insurance ...........................................................................................13
4.15   Brokers ..............................................................................................13
4.16   Attorneys ...........................................................................................13
4.17   Retainers ............................................................................................13
4.18   Disclosure ..........................................................................................14
4.19   No Event of Default ...........................................................................14
SECTION V.   AFFIRMATIVE COVENANTS. .....................................................14
5.1   Preservation of Existence ..................................................................14
5.2   Maintenance of Properties; Insurance ...............................................14
5.3   Payment of Taxes ...............................................................................14
5.4   Field Audit and Examinations ...........................................................15
5.5   Accounting; Financial Statements and Other Information .................15
5.6   Compliance .........................................................................................16
5.7   ERISA .................................................................................................17
5.8   Change in Business. ...........................................................................17
5.9   Notification to Lender ........................................................................17
5.10   Further Assurances ............................................................................17

{503877;4}

| | | |
|---|---|---:|
| 5.11 | Additional Guarantor | 17 |
| 5.12 | Attorneys' Good Standing | 17 |
| **SECTION VI.** | **NEGATIVE COVENANTS** | **17** |
| 6.1 | Investments and Guarantee | 17 |
| 6.2 | Limitation on Liens | 18 |
| 6.3 | Additional Obligations | 18 |
| 6.4 | Return of Capital | 18 |
| 6.5 | Mergers, Etc. | 18 |
| 6.7 | Retainers | 19 |
| 6.8 | Ownership | 19 |
| 6.9 | Compensation | 19 |
| 6.10 | Borrower to Bear Loan Costs | 19 |
| **SECTION VII.** | **EVENTS OF DEFAULT/REMEDIES** | **19** |
| 7.1 | Events of Default | 19 |
| 7.2 | Remedies | 21 |
| **SECTION VIII.** | **MISCELLANEOUS** | **21** |
| 8.1 | Expenses | 21 |
| 8.2 | Survival of Agreement | 21 |
| 8.3 | No Waiver; Cumulative Remedies | 21 |
| 8.4 | Notices | 22 |
| 8.5 | Amendments and Waivers | 22 |
| 8.6 | Applicable Law | 22 |
| 8.7 | Successors | 23 |
| 8.8 | Partial Invalidity | 23 |
| 8.9 | Headings and Word Meanings | 23 |
| 8.10 | Waiver of Jury Trial | 23 |
| 8.11 | Jurisdiction; Service of Process | 23 |
| 8.12 | Conflicts | 24 |
| 8.13 | Privileged Information | 24 |

Exhibit A    -    Borrowing Notice
Exhibit B    -    Borrowing Base Certificate
Exhibit C    -    Revolving Note

{503877;4}

## CREDIT AGREEMENT

**CREDIT AGREEMENT** dated as of March 1, 2006, between **WOODFILL & PRESSLER, L.L.P.**, a Texas limited liability partnership having an office at 1330 Post Oak Boulevard, Suite 2800, Houston, Texas 77056 (the "Borrower"), and **THE STILLWATER ASSET-BACKED FUND LP**, a Delaware limited partnership having an office at 41 Madison Avenue, New York, New York 10010 (the "Lender").

## R E C I T A L S:

A.      Borrower is engaged in the practice of law, and derives most if its income from contingent fees for professional services rendered as counsel.

B.      The Borrower desires the Lender to make loans to the Borrower in an aggregate principal sum not to exceed $5,000,000 at any one time outstanding.

C.      The Lender is willing, subject to and upon the terms and conditions set forth herein and in the other Financing Agreements to make such loans to the Borrower.

NOW, THEREFORE, IT IS AGREED:

**SECTION I.**             **DEFINITIONS**

1.1      Definitions.  As used in this Agreement, the following terms shall have the following meanings, unless the context otherwise requires:

"Account" shall have the meaning ascribed to it in the New York Uniform Commercial Code, and "Accounts" shall mean more than one Account.

"Agreement" shall mean this Credit Agreement, as amended, modified or supplemented from time to time in accordance with its terms.

"Anticipated Cash Flow" shall mean such amount determined by Lender, in its sole discretion, as representing an estimate of the fees and other amounts the Borrower will receive prior to the Maturity Date, or such other date as is mutually agreed to in writing (net of any co-counsel or forwarding fees which the Borrower is obliged to pay to any other Person) from any source, including, without limitation, from Cases in which the Lender has a first Lien on the Borrower's interest in the proceeds of any judgment, award, compromise and/or settlement.  In determining Anticipated Cash Flow for Cases, the analysis shall be made on a Case by Case basis considering among other factors (a) liability, (b) damages, (c) the availability of funds to satisfy an award (from insurance or otherwise), (d) costs to conclude the Case, (e) the status of the Case, and the time frame to conclusion, and (f) the Borrower's fee arrangement.  Subject in all respects to the next sentence hereof, the Lender shall be guided by the Case Status Reports and consultations with the Borrower in determining Anticipated Cash Flow.  In determining Anticipated Cash Flow the Lender shall have the right in its sole and absolute judgment to make the final determination thereof and all such determinations shall be final and binding on the Borrower.

"Applicable Percentage" shall mean a percentage of Anticipated Cash Flow, determined from time to time by the Lender in its sole and absolute discretion.  In determining the Applicable Percentage the Lender shall have the right in its sole and absolute judgment to make the final

determination thereof and all such determinations shall be final and binding on the Borrower.  The Lender shall promptly notify the Borrower of any changes in the Applicable Percentage.

"Availability" shall mean, as at any date at which the same is to be determined, the excess, if any, of (i) the lesser of (a) the Commitment, or (b) the product of (x) Anticipated Cash Flow and (y) the Applicable Percentage, over (ii) the principal sum of the Loans then outstanding plus any unpaid fees payable hereunder, and all accrued interest thereon.

"Borrower" shall have the meaning set forth in the preamble to this Agreement.

"Borrowing Base Certificate" shall mean a certificate to be delivered by the Borrower to in the Lender as provided in Section 5.5.4 hereof, in substantially the form of Exhibit B annexed hereto.

"Borrowing Notice" shall have the meaning set forth in Section 2.1.3.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required to close under the laws of the State of New York.

"Case" and "Cases" means any pending litigated matter or arbitration where the Borrower is the attorney of record for the plaintiff or plaintiffs.

"Case Status Report" shall have the meaning defined in Section 5.5.6.

"Cash Equivalents" shall mean:

(i)     demand deposits at, or certificates of deposit in Dollars of, any Institutional Lender;

(ii)    readily marketable direct obligations of the United States government or any agency thereof which are backed by the full faith and credit of the United States;

(iii)   investments in money market mutual funds registered under the Investment Company Act of 1940 having assets in excess of $2,500,000,000;

(iv)    commercial paper at the time of acquisition having the highest rating obtainable from either Standard & Poor's Corporation or Moody's Investor Service, Inc.; and

(v)     federally tax exempt securities rated "A" or better by either Standard & Poor's Corporation or Moody's Investor Service, Inc.

provided that, in each case mentioned in (i), (ii), and (iv) above, such obligations shall mature not more than one year from the date of acquisition thereof.

"Closing Date" shall mean March 1, 2006.

"Collateral" shall mean all of the property of the Borrower in which the Lender has been, or shall hereafter be, granted a lien or security interest under the Security Agreement.

"Commitment" shall mean $5,000,000.

"Default" shall mean any condition, act or event that, with notice or lapse of time or both, would constitute an Event of Default.

"Dollars" or the symbol "$" shall mean dollars in lawful currency of the United States of America.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations and published interpretations thereof.

"ERISA Affiliate" shall mean an entity, whether or not incorporated, which is under common control with the Borrower within the meaning of Section 414(b) or 414(c) of the Internal Revenue Code of 1986, as amended.

"Event of Default" shall have the meaning assigned to such term in Section 7 hereof.

"Existing Lenders" shall mean Core Funding Group, LLC and Frost Bank.

"Financing Agreements" shall mean the following agreements and instruments (as such agreements and instruments may be hereafter amended, modified or supplemented in accordance with their respective terms): (i) this Agreement, (ii) the Security Agreement, (iii) the Revolving Credit Note, (iv) the Guarantee, (v) the Pledge Agreement and (vi) any other supplementary security agreements or other collateral documents now or hereafter delivered to the Lender by the Borrower, or the Guarantor.

"GAAP" shall mean principles that are (i) consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made, and (ii) consistently applied with past financial statements of the Borrower.

"Guarantor" shall mean Jared R. Woodfill V.

"Guarantor Collateral" shall mean all of the property of the Guarantor in which the Lender has been, or shall hereafter be, granted a lien or security interest under the Pledge Agreement.

"Guarantee" shall have the meaning set forth in Section 2.4.1 hereof.

"Indebtedness" shall mean, with respect to any specified Person, (i) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person for the deferred purchase price of property or services, except current accounts payable arising in the ordinary course of business and not overdue beyond 90 days, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (v) all payment obligations of such Person with respect to interest rate or currency protection agreements, (vi) all obligations of such Person as an account party under any letter of credit or in respect of bankers' acceptances, (vii) all obligations of any third party secured by property or assets of such Person (regardless of whether or not such Person is liable for repayment of such obligations), and (viii) all guarantees or other contingent liability of such Person.

"Institutional Lender" shall mean any savings bank, savings and loan association, commercial bank or trust company, insurance company, or any holding or service company of any of the

foregoing, in each case having capital of not less than $400,000,000 and authorized to do business in the United States.

"Lender" shall have the meaning set forth in the preamble to this Agreement.

"Loan" and "Loans" shall each have the meanings set forth in Section 2.1.1.

"Maturity Date" shall mean the earlier to occur of (i) the second anniversary date of the Closing Date, unless such date is hereafter extended by the Lender in writing and, (ii) such date as the Loans shall otherwise be payable in full in accordance with the terms of this Agreement.

"Multiemployer Plan" shall mean a Plan described in Section 4001(a)(3) of ERISA.

"Net Cash Receipts" shall mean (a) the fees and other amounts received by the Borrower from any source, including, without limitation, case expense reimbursements, less (b) fees which the Borrower is obliged to pay to pursuant to a Third Party Agreement.

"Obligations" means all obligations, liabilities and indebtedness of the Borrower to the Lender, whether now existing or hereafter created, direct or indirect, due or not, whether created directly or acquired by assignment or otherwise, including, without limitation, all obligations, liabilities and indebtedness of the Borrower with respect to the Loans, and the payment and performance of all other obligations, liabilities, and indebtedness of the Borrower to the Lender hereunder, under any one or more of the other Financing Agreements, including, without limitation, all fees, costs, expenses and indemnity obligations hereunder or thereunder.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Person" shall mean an individual, partnership, joint venture, firm, corporation, limited liability company, trust, charitable institution or other business or legal entity.

"Plan" shall mean any pension plan, which is covered by Title IV of ERISA and in respect of which the Borrower or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" shall have the meaning set forth in Section 2.4.2 hereof.

"Prohibited Transaction" shall mean any transaction set forth in Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time.

"Regulation G" shall mean Regulation G of the Board of Governors of the Federal Reserve System as amended or supplemented from time to time.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as amended or supplemented from time to time.

"Reportable Event" shall mean any of the events set forth in Section 4043 of ERISA.

"Revolving Credit Note" shall have the meaning set forth in Section 2.1.4 hereof.

"Security Agreement" shall have the meaning set forth in Section 2.4.2 hereof.

{503877;4}

4

"Settled Not Resolved Cases" shall mean Cases which have been settled pursuant to a stipulation, settlement agreement, or other document to the similar effect, or by court order, with respect to which there is an agreement by the defendant(s) to pay a specific amount to the plaintiff(s), but no resolution as to the amount of the fee payable to the Borrower for its legal services.

"Settled Resolved Cases" shall mean Cases which have been settled pursuant to a stipulation, settlement agreement, or other document to the similar effect, or by court order, with respect to which there is both an agreement (i) by the defendant(s) to pay a specific amount to the plaintiff(s), and (ii) to pay a specific amount to the Borrower, as a fee for its legal services.

"Third Party Agreement" shall mean any written agreement between the Borrower and any Person pursuant to which the Borrower is obligated to pay co-counsel, referral or other fees to such Person.

1.2    Accounting Terms.   Any accounting terms used in this Agreement, which are not specifically defined herein, shall have the meanings customarily given to such terms in accordance with GAAP.  In the event that changes in GAAP shall be mandated by the Financing Accounting Standards Board, and such changes would materially modify the interpretation or computation of the financial covenants contained in this Agreement at the time of execution hereof, then in such event such changes shall not be followed in calculating the financial covenants.

## SECTION II.        FINANCING

2.1    Loans.

2.1.1  Subject to the terms and conditions set forth in this Agreement, at the Borrower's request, the Lender may in its sole and absolute discretion, make cash advances (each a "Loan" and collectively the "Loans") to the Borrower at any time, and from time to time, from the date hereof to, but not including, such date as is one-hundred eighty (180) days before the Maturity Date.

2.1.2  Subject to the terms and conditions set forth in this Agreement, the Borrower may borrow, repay and re-borrow Loans; provided, however, that the Borrower shall not be entitled to borrow more than one (1) Loan each month and; provided, further, that Loans may not be borrowed after the fifth (5th) Business Day of any month.  The initial Loan shall be in the minimum principal sum of at least $250,000, and each subsequent Loan shall be in the minimum principal sum of $25,000 or in integral multiples of $25,000 in excess thereof, or in the amount of the remaining Availability if such amount is less than $25,000.

2.1.3  The Borrower shall give the Lender notice of each proposed borrowing of a Loan at least ten (10) Business Days before such proposed borrowing; provided, however, that if the amount of such proposed borrowing is less than $25,000, only two (2) Business Days notice shall be required.  The notice shall specify (i) the date of such borrowing, (ii) the amount thereof (which shall be in accordance with the provisions of this Agreement), and (iii) and shall otherwise be in the form of Exhibit A annexed hereto (the "Borrowing Notice").  Each Borrowing Notice shall be effective upon approval by the Lender in its sole discretion and shall irrevocably commit the Borrower to borrow in accordance with the terms of this Agreement.

2.1.4  Concurrently with the execution and delivery of this Agreement, the Borrower shall evidence its obligation to pay the principal of and interest on the Loans by executing and delivering to the Lender a promissory note in the principal sum of $5,000,000 in the form attached hereto as Exhibit

C (as the same may be amended, restated or substituted from time to time, the "Revolving Credit Note"). The outstanding principal sum of the Loans, plus all interest and fees therein shall be payable as provided in the Revolving Credit Note and this Agreement, but in any event shall become immediately due and payable on the Maturity Date.

2.1.5  In no event shall the aggregate principal balance of the Loans then outstanding exceed the Availability. If, at any time, the aggregate principal balance of the Loans then outstanding shall exceed the Availability, the Borrower shall immediately (but in any event within one (1) Business Day after the Lender notifies the Borrower of such excess) repay the Loans in an amount equal to such excess.

2.1.6  For purposes of computing Availability, Anticipated Cash Flow and the Applicable Percentage will be computed by the Lender on a daily, or other periodic basis, as determined by the Lender in its sole and absolute discretion, based, in part, on the information  delivered to the Lender pursuant to Section 5.5.4.

2.2    Interest.  The Loans shall bear interest determined as follows:

2.2.1  Calculation of Interest.  Interest on the Loans shall be computed on the basis of a 360-day year over the actual number of days elapsed.

2.2.2  Interest Rate.  The outstanding principal balance of the Loans shall bear interest at the rate equal to nineteen percent (19%) per annum, simple, from the Closing Date until, but not including, the first anniversary date of the Closing Date.  After the end of such period, the outstanding principal balance of the Loans shall then bear interest at the rate equal to twenty-one percent (21%) per annum, simple, until the Maturity Date.  The Borrower shall pay interest on the outstanding principal balance of the Loans at the foregoing rate monthly in arrears on the first day of each month, and at maturity (whether by acceleration or otherwise).

2.2.3  Interest Upon Event of Default.  Upon the occurrence and during the continuance of an Event of Default, the Borrower shall on demand pay interest, to the extent permitted by law, on the unpaid Obligations at a rate per annum equal to four (4%) percent in excess of the rate otherwise applicable to such Obligations, but in no event in excess of the maximum rate permitted by applicable law.

2.2.4  Maximum Rate.  Notwithstanding anything otherwise in this Section 2.2 to the contrary, the rate of interest payable by the Borrower shall not exceed the maximum rate permitted by applicable law.  In the event the interest paid by the Borrower shall exceed the maximum lawful rate, at the Lender's option, the excess shall be applied in reduction of the principal balance of the Loans, or repaid to the Borrower.

2.3    Payment.

2.3.1  Interest Payments.  Accrued interest shall be paid on the first day of each month.

2.3.2  Amount of Repayment.  The outstanding principal amount of the Loans and the accrued interest thereon, shall be repaid monthly, by the fifth (5th) day of each month, measured from the 21st of the preceding calendar month to the 20th of the current calendar month as follows:

(i)      for the first ninety (90) days following the Closing Date:

(A)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is greater than $3,000,000, fifty percent (50%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans; or

(B)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is less than or equal to $3,000,000, thirty percent (30%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans; and

(ii)    for the period beginning ninety-one (91) days following the Closing Date to, but not including, the first anniversary of the Closing Date:

(A)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is greater than $3,000,000, seventy-five percent (75%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans; or

(B)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is less than or equal to $3,000,000, thirty percent (30%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans; and

(iii)   thereafter:

(A)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is greater than $2,000,000, seventy-five percent (75%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans; or

(B)     if the outstanding principal balance of the Loans (as measured on the date of such principal repayment, without taking any such repayment into effect) is less than or equal to $2,000,000, fifty percent (50%) of the Borrower's Net Cash Receipts received in the immediately preceding month shall be used to repay the Loans.

2.3.3   Payment at Maturity.  On the Maturity Date, the Borrower shall pay all of the Obligations in full.

2.3.4   <u>Manner of Payment</u>.   All payments required to be made by the Borrower hereunder on account of principal, interest, or fees shall be made in Dollars, in immediately available funds, at the office of the Lender at 41 Madison Avenue, New York, New York 10010, or at such other place as the holder of the Revolving Credit Note shall specify in writing.   Whenever any payment hereunder, or under any of the Financing Agreements, becomes due on a day on which the Lender is closed (as required or permitted by law or otherwise), such payment shall be made not later than the next succeeding Business Day, and such extension of time shall be included in the computation of interest. The Borrower authorizes (but shall not require) the Lender to debit any account maintained by the Borrower or draw against the Availability by creating a Loan on any date on which a payment is due to the Lender hereunder or under any of the Financing Agreements, in an amount equal to any unpaid portion of such payment.

2.4   <u>Security and Guarantee</u>.

2.4.1 <u>Guarantee</u>.   Concurrently with the execution and delivery of this Agreement, the Guarantor shall guarantee the Obligations of the Borrower to the Lender pursuant to a guarantee agreement executed by him, dated as of even date herewith (the "<u>Guarantee</u>").

2.4.2 <u>Security</u>.   To secure repayment of the Loans, the Borrower shall grant a valid and perfected security interest to the Lender in the Collateral pursuant to a security agreement, dated as of even date herewith (the "<u>Security Agreement</u>") and Jared R. Woodfill V shall grant a valid and perfected security interest to the Lender in the Guarantor Collateral pursuant to a pledge agreement, dated as of even date herewith (the "<u>Pledge Agreement</u>").

2.5   Intentionally Omitted.

2.6   <u>Fees</u>.

2.6.1   <u>Origination Fee</u>.   The Borrower shall pay the Lender an origination fee of $100,000 on or prior to the Closing Date.

2.6.2   <u>Management Fee</u>.   The Borrower shall pay the Lender a management fee of $1,500 payable at the close of each calendar quarter during which the Agreement is in effect and at the Maturity Date, to cover audit costs and for the Lender's day-to-day services in conjunction with portfolio review and other oversight activities, which fee shall be due and payable in arrears at the close of each such calendar quarter and at the Maturity Date.

2.6.3   <u>Line Maintenance Fee</u>.   The Borrower shall pay the Lender a line maintenance fee of $50,000 payable on the first anniversary of the Closing Date.

2.6.4   <u>Legal Fee</u>.   The Borrower shall pay the Lender a fee on or prior to the Closing Date to cover the legal fees and expenses incurred by the Lender in the preparation of the Financing Agreements.

2.6.5   <u>Termination Fee</u>.   If the Borrower shall terminate the Commitment, either voluntarily or pursuant to the provision hereunder, at any time within six (6) months from the Closing Date, the Borrower shall pay to the Lender a termination fee of $250,000.

2.7   Intentionally Omitted.

2.8    Right To Debit Account.   The Borrower authorizes (but shall not require) the Lender to debit any account maintained by the Borrower, except trust and escrow accounts, on any date on which a payment or fee is due to the Lender hereunder or under any of the other Financing Agreements, in an amount equal to any unpaid portion of such payment or fee.

## SECTION III.        CONDITIONS PRECEDENT

3.1    Conditions to the Making of the Loans.   The making of the Loans by the Lender is subject to the conditions precedent that:

3.1.1   Financing Agreements.   The Borrower and each of the Guarantor shall have executed and delivered to the Lender the Financing Agreements to be executed by each of them, and all other agreements, instruments and documents required or contemplated by this Agreement and the Financing Agreements.

3.1.2   Evidence of Partnership Action; Certificate and Agreement.   The Lender shall have received (i) copies of all action taken by the Borrower to authorize the execution, delivery and performance of this Agreement and the other Financing Agreements to be executed by it; (ii) a copy of the Borrower's Certificate of Formation, as amended to date; (iii) a copy of the Limited Partnership Agreement of the Borrower, as amended to date, and (iv) an incumbency certificate from the Borrower. All of the documents listed in subsections (i) through (iv) shall be certified by a shareholder of the Borrower in a Certificate dated as of even date herewith.

3.1.3   Insurance.   The Lender shall have received correct and complete copies of all insurance policies of the Borrower in compliance with Sections 5.2.2 and 5.2.3 hereof and the certificates required thereby.

3.1.4   Field Audit.   The Lender shall have conducted a satisfactory examination of the books and records of the Borrower, including the records of all Cases included in the calculation of Anticipated Cash Flow.

3.1.5   Security Interest.   The Lender shall have received evidence that all actions necessary or, in the opinion of the Lender and its counsel, desirable, to create and perfect the security interests and other liens granted under the Security Agreement have been duly taken, and that there are no security interests senior to the security interests granted in favor or for the benefit of the Lender except such other security interests as may be permitted by the terms of this Agreement to be senior to the security interests granted in favor of the Lender.

3.1.6   Borrowing Base Certificate.   The Lender shall have received a Borrowing Base Certificate, dated as of the Closing Date.

3.1.7   Case Status Reports.   On or prior to the Closing Date, the Lender shall have received updated Case Status Reports from the Borrower, as more fully described in Section 5.5.6 hereof.

3.1.8   Financial Statements.   On or prior to the Closing Date, the Lender shall have received from the Borrower, the Borrower's financial statements for the annual period ended December 31, 2005 (consisting of balance sheets and related statements of income, retained earnings, partners' equity and cash flows for the period then ended, including the related schedules annexed thereto).

3.1.9   Existing Lender(s).   The Indebtedness owed to the Existing Lenders shall have been paid in full, and the Lender shall have received copies of all payoff letters, UCC-3 termination

{503877;4}

statements and other release documents terminating the liens and security interests of the Existing Lenders, each in form and substance satisfactory to the Lender.

    3.1.10   <u>Prepaid Interest Account</u>.  The Borrower shall deposit with the Lender $80,000 to be applied to the payment of interest, which amount shall be paid form the initial Loan.

    3.2   <u>Post Closing Date Preconditions</u>.  As of the date of the making of any Loan to the Borrower, as a condition to the making of such Loan:

    3.2.1   <u>Representations and Warranties</u>.  All representations and warranties contained herein or otherwise made to the Lender pursuant to this Agreement or any of the Financing Agreements shall be true, complete and correct in all material respects.

    3.2.2   <u>Event of Default</u>.  There shall exist no Default or Event of Default.

    3.2.3   <u>No Adverse Change</u>.  There shall have been no material adverse change in the operations, business, property or assets or in the condition (financial or otherwise) of the Borrower or the Guarantor.

## SECTION IV.    <u>REPRESENTATIONS AND WARRANTIES</u>

In order to induce the Lender to enter into this Agreement and to make the Loans hereunder, the Borrower represents and warrants to the Lender as follows:

    4.1   <u>Organization</u>.

    4.1.1 The Borrower is a duly organized and validly existing limited liability partnership in good standing under the laws of the State of Texas with perpetual existence, and has all requisite right, power and authority and all necessary licenses and permits to own and operate its assets and properties and to carry on the practice of law, and all other business activities now conducted and as presently proposed to be conducted.  The Borrower has qualified and is in good standing as a foreign limited liability partnership in each state or other jurisdiction where the nature of its business or the ownership or use of its property requires such qualification, except such jurisdictions, if any, in which the failure to be so qualified will not have a material and adverse effect on either the conduct of its business or the ownership of its properties.

    4.1.2   The Guarantor owns ninety percent (90%) of the issued and outstanding partnership interests of the Borrower and serves as Managing Partner of the Borrower.

    4.2   <u>Authorization</u>.  The Borrower has all requisite legal right, power and authority to execute, deliver and perform the terms and provisions of this Agreement, the other Financing Agreements executed by it, and all other instruments and documents delivered by it pursuant hereto and thereto.  The Borrower has taken or caused to be taken all necessary action to authorize the execution, delivery and performance of this Agreement, the other Financing Agreements executed by it and any other related agreements, instruments or documents delivered or to be delivered by the Borrower pursuant hereto and thereto.  This Agreement, the other Financing Agreements executed by the Borrower and all related agreements, instruments or documents delivered or to be delivered pursuant hereto or thereto constitute and will constitute legal, valid and binding obligations of the Borrower, enforceable in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar

laws affecting the enforcement of creditors' rights generally, and to the exercise of judicial discretion in accordance with general principles of equity.

4.3     No Conflicts.  Neither the execution and delivery of this Agreement, the other Financing Agreements, or any of the instruments and documents delivered or to be delivered pursuant hereto or thereto, by the Borrower, nor the consummation of the transactions herein or therein contemplated, nor compliance with the provisions hereof or thereof, will violate any law, statute or regulation, or any order, writ or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default in any respect under, any indenture, mortgage, deed of trust, agreement or other instrument to which the Borrower is a party, or by which it or any of its properties may be bound or affected, or will result in the creation or imposition of any lien, charge or encumbrance upon any of their respective properties (except as contemplated hereunder or under the other Financing Agreements) or will violate any provision of the Certificate of Formation or Limited Partnership Agreement of the Borrower, each as amended to date.

4.4     Compliance and Other Agreements.

4.4.1     Neither the Borrower nor the Guarantor is in default under any indenture, mortgage, deed of trust, agreement or other instrument to which it or he is a party, or by which it or he or any of its or his properties may be bound or affected, except for such defaults which, individually or in the aggregate, will not have a material and adverse effect on the business, operations, property or assets or on the condition, financial or otherwise, of the Borrower or the Guarantor.

4.4.2     The Borrower is not in default with respect to any order, writ, injunction or decree of any court or of any federal, state, municipal or other governmental department, commission, board, bureau, agency or authority, domestic or foreign, or in violation of any law, statute or regulation, domestic or foreign, to which it is, or any of its properties are, subject, except for such defaults or violations which, in the aggregate, will not have a material and adverse effect on the business, operations, property or assets or on the condition, financial or otherwise, of the Borrower.

4.4.3     Neither the Borrower nor the Guarantor is party to or bound by, nor is any of its properties bound or affected by, any agreement, deed, lease or other instrument, or subject to any charter or other corporate restriction or any judgment, order, writ, injunction, decree or award, or any law, statute, rule or regulation, any of which materially and adversely affects or in the future may (so far as the Borrower may now foresee) materially and adversely affect the business, operations, prospects, properties or assets, or the condition, financial or otherwise, of the Borrower or the Guarantor.

4.5     ERISA.  The Borrower is in compliance in all material respects with all applicable provisions of ERISA.  Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan; no notice of intent to terminate a Plan has been filed nor has any Plan been terminated; no circumstances exist which constitute grounds under Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administrate, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower, nor any ERISA Affiliate thereof has completely or partially withdrawn from a Multiemployer Plan; the Borrower, and each ERISA Affiliate have met their minimum funding requirements under ERISA with respect to all of their Plans and the present fair market value of all Plan assets exceeds the present value of all vested benefits under each Plan, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA and the regulations thereunder for calculating the potential liability of the Borrower or any ERISA Affiliate to PBGC or the Plan under Title IV of ERISA; and neither the Borrower nor any ERISA Affiliate has incurred any liability to the PBGC under ERISA.

4.6     Approvals and Consents.     All authorizations, consents, registrations, exemptions, approvals and licenses (governmental or otherwise) or the taking of any other action (including, without limitation, by the partners of the Borrower) which are required as a condition to the validity or enforceability of this Agreement, the other Financing Agreements or any of the instruments or documents delivered or to be delivered pursuant hereto or thereto, have been effected or obtained and are in full force and effect.

4.7     Investment Company.     The Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

4.8     Regulation U; Securities Exchange Act of 1934.     The Borrower is not engaged principally, or as one of its more important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulation U or G of the Board of Governors (the "Board") of the Federal Reserve System).  None of the proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for any other purpose that might constitute this transaction a "purpose credit" within the meaning of such Regulation U. The Borrower will not take, nor permit any agent acting on its behalf to take, any action which might cause this Agreement or any of the Financing Agreements to violate any regulation of the Board or to violate the Securities Exchange Act of 1934, in each case as in effect on the date hereof or as amended hereafter.

4.9     Use of Funds.     The proceeds of the Loans shall be used by the Borrower as follows: (i) not more than $4,000,000 shall be used for the repayment of those certain outstanding loan facility arrangements of the Borrower with the Existing Lenders; and (ii) the remainder shall be used to fund the working capital needs of the Borrower.

4.10     Financial Statements.

4.10.1 The Borrower has heretofore delivered to the Lender its financial statements for its fiscal year ended December 31, 2005 (consisting in each case of balance sheets and related statements of income, retained earnings, partners' equity and cash flows for the fiscal year or period then ended, including the related schedules annexed thereto) which year-end financial statements were prepared on a review basis. Such financial statements were prepared in accordance with GAAP and present fairly the financial position and results of operations of the Borrower as of the dates of and for the periods involved. There are no liabilities, direct or indirect, fixed or contingent, of the Borrower as of the date of such financial statements that were not reflected therein or in the notes thereto in accordance with GAAP. There has been no material adverse change since December 31, 2005 in the business, operations, property, or assets of the Borrower.

4.10.2   The Borrower has heretofore delivered a personal financial statement, dated December 31, 2005, for the Guarantor and copies of the Guarantor's federal income tax returns for 2004. The financial statements are correct and complete and set forth all of the material assets and liabilities of maker thereof (including contingent liabilities).

4.11     Taxes.     The Borrower and each of the Guarantor has filed or caused to be filed all tax returns required to be filed by it or him.  The Borrower and each of the Guarantor has paid all taxes (including interest and penalties) as shown on such returns or any assessment or notice of tax claim or deficiency received by it or him to the extent that such taxes have become due except as otherwise disclosed on Schedule 4.11.  The Borrower has no knowledge of any proposed material tax assessment against or affecting it or the Guarantor, and neither the Borrower nor the Guarantor is otherwise obligated

by any agreement, instrument or otherwise to contribute to the payment of taxes owed by it or him, or any other Person, except as is otherwise disclosed on <u>Schedule 4.11</u>. All material tax liabilities are adequately provided for or reserved against on the books of the Borrower in accordance with GAAP.

4.12    <u>Title to Properties/Priority of Liens.</u>

4.12.1  The Borrower has good and marketable title to, or valid leasehold interests in, all of the properties and assets reflected on the most recent of the financial statements delivered to the Lender pursuant to Section 4.10 or acquired by it after the date of such financial statement and prior to the date hereof, except for those properties and assets which have been disposed of since such date in the ordinary course of business. All such properties and assets are owned or leased by the Borrower free and clear of all mortgages, pledges, liens, security interests, encumbrances or charges of any kind, except (i) such as are disclosed on <u>Schedule 4.12</u> hereto, (ii) such as are in favor of the Lender, and (iii) such as are permitted under the provisions of Section 6.2 hereof.

4.12.2  The liens and security interests granted to the Lender by the Borrower under the Security Agreement constitute valid and perfected liens and security interests in the collateral secured thereby and, except as disclosed on <u>Schedule 4.12</u> hereto, such liens and security interests shall be prior to all other liens and security interests in such collateral.

4.13    <u>Litigation.</u>  There are no actions, suits, investigations or administrative proceedings of or before any court, arbitrator, governmental authority, bar association or other body responsible for the professional conduct of attorneys, pending or threatened against the Borrower or the Guarantor or any of their respective properties or assets which (i) either in any case or in the aggregate, if adversely determined, would materially and adversely affect the business, operations, prospects, properties or assets or the condition, financial or otherwise, of the Borrower or the Guarantor, or (ii) question the validity or enforceability of this Agreement, the Financing Agreements, or any action to be taken in connection with the transactions contemplated hereby or thereby, or (iii) with respect to the Guarantor or any attorney in the employ of the Borrower, question such Person's ethical conduct in the course of his practice of law, or seek to impose professional sanctions or his suspension or disbarment from the practice of law.

4.14    <u>Insurance.</u>  All physical properties and assets of the Borrower are insured in accordance with the requirements of Section 5.2.2 hereof. The Borrower, the Guarantor, and each other attorney employed by the Borrower or appearing "of counsel" to the Borrower, is insured in accordance with the requirements of Section 5.2.3 hereof.

4.15    <u>Brokers.</u>  The Borrower has not taken, and will not take, any action which would cause the Lender to have any obligation or liability to any Person for finders fees, brokerage fees, agents' commissions or like payments in connection with the execution and delivery of this Agreement, or the consummation of the transactions contemplated hereby. All fees payable to Case Funding will be paid by and will be the sole obligation of the Borrower.

4.16    <u>Attorneys.</u>  The Guarantor and each other attorney employed by or appearing "of counsel" to the Borrower is duly admitted to practice, and in good standing as an attorney in the State of Texas, and is not subject to any sanction or proceeding by or before any Division of the Supreme Court of the State of Texas or any Bar Association, or any similar organization.

4.17    <u>Retainers.</u>  The Borrower's retainer agreements for its Cases, copies of each of which have been provided to the Lender, were duly and validly authorized, executed and delivered by the Borrower and the client and constitute the legal, valid and binding obligation of each party thereto, have not been amended, modified or rescinded, are lawful and in accordance with all legal and ethical

requirements applicable to the Borrower, and unless otherwise specifically stated therein, the Borrower is the only counsel engaged by the plaintiff(s) with respect to each of the Cases.

4.18   Disclosure.   No certificate, statement, report or other document furnished to the Lender by or on behalf of the Borrower or the Guarantor in connection. herewith or in connection with any transaction contemplated hereby, or this Agreement, or any Financing Agreement, contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained therein not misleading.

4.19   No Event of Default.   After giving effect to the transactions contemplated by this Agreement, the other Financing Agreements and the other instruments or documents delivered in connection herewith and therewith, there does not exist at the date hereof any Default or Event of Default.

4.20   Third Party Agreements.   All of the Borrower's Third Party Agreements in effect on the Closing Date, copies of each of which have been provided to the Lender, were duly and validly authorized, executed and delivered by the Borrower and the Person party thereto and constitute the legal, valid and binding obligation of each party thereto, have not been amended, modified or rescinded.

**SECTION V.**   **AFFIRMATIVE COVENANTS**

The Borrower covenants and agrees that, until all of the Obligations are paid and satisfied in full, it shall comply, or cause compliance with, the following covenants:

5.1   Preservation of Existence.   The Borrower will preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its formation and will qualify and remain qualified as a foreign limited liability partnership in each jurisdiction in which such qualification is necessary or desirable in view of its business and operations or in view of the ownership of its properties.

5.2   Maintenance of Properties; Insurance.

5.2.1   The Borrower will maintain in good repair, working order and condition all properties used or useful in its business (ordinary wear and tear excepted) and from time to time will make or cause to be made all appropriate repairs, renewals and replacements, additions and improvements thereto.

5.2.2   The Borrower shall maintain at its expense, with financially sound and reputable insurers reasonably acceptable to the Lender, with respect to its properties and business, against loss or damage of the kinds and in the amounts customarily insured against by businesses of established reputation engaged in the same or a similar business and similarly situated.

5.2.3   The Borrower and/or the Guarantor will maintain at its expense, with financially sound and reputable insurers reasonably acceptable to the Lender, professional malpractice insurance with claim limits of not less than $1,000,000 per occurrence, and $1,000,000 in the aggregate.

5.2.4   The Borrower shall provide the Lender with evidence satisfactory to the Lender that each policy provided for in this Section 5.2 is in full force and effect, and each such policy shall provide that the Lender shall receive not less than thirty (30) days' notice of cancellation.

5.3   Payment of Taxes.   The Borrower and each of the Guarantor will pay and discharge promptly all taxes (including, without limitation, all payroll withholdings), assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its property, real, personal

or mixed, or upon any part thereof, before the same shall become in default; provided, however, that neither the Borrower nor the Guarantor shall be required to pay any such tax, assessment, charge, levy or claim if the validity or amount thereof shall be contested in good faith by proper proceedings, and if the Borrower it shall have set aside on its books appropriate reserves.

    5.4    <u>Field Audit and Examinations</u>.  Without limiting the rights of the Lender under any other Financing Agreement, the Lender, or any Person designated by the Lender, shall have the right, from time to time to call at the place or places of business of the Borrower (or any other place where the Collateral or any information relating thereto is kept or located) during reasonable business hours, and without hindrance or delay, and in the absence of a Default or an Event of Default, upon one (1) Business Days notice, (i) to inspect, audit, check and make copies of and extracts from the books, records, journals, correspondence and other data relating to the business of the Borrower, including without limitation (except as may be prohibited by the attorney-client privilege) all files relating to the Cases, (ii) to verify such matters concerning the Collateral as the Lender (in its sole and absolute discretion) may consider appropriate, and (iii) to discuss the affairs, finances and business of the Borrower with its officers, directors and accountants.  In addition, the Borrower shall assist the Lender in its analysis of the Cases, including without limitation (i) a liability assessment and damage assessment, (ii) time line for recovery, and (iii) the estimated costs.  Upon request, the Borrower will provide the Lender with copies of such documents as the Lender may reasonably request.  The Borrower shall pay on demand all expenses reasonably incurred by the Lender in acquiring information pursuant to this Section 5.4, including, without limitation, an examination fee of $850 per person per day for such audits.  In addition to the foregoing, the Borrower shall provide the Lender with electronic access to view the Borrower's bank accounts, if such access is available.

    5.5    <u>Accounting; Financial Statements and Other Information</u>.  The Borrower will maintain a system of accounting established and administered in accordance with GAAP and will set aside on its books all such proper reserves for each fiscal year for depreciation, obsolescence, amortization, bad debts and other purposes as shall be required by GAAP.  The Borrower will deliver, or cause to be delivered, to the Lender:

    5.5.1  As soon as practicable following the end of its first, second and third fiscal quarters, but in any event not later than thirty (30) days thereafter, an unaudited balance sheet of the Borrower as of the end of such quarter and the related statements of income, retained earnings, and partners' equity for such quarter, all in reasonable detail and satisfactory in scope to the Lender, setting forth for each such period in comparative form the corresponding figures for the appropriate period of the preceding fiscal year, which statements shall be prepared in accordance with GAAP and, subject to normal year-end adjustments, shall present fairly the financial position and operations of the Borrower as at the end of the period involved;

    5.5.2  As soon as practicable after the end of each fiscal year of the Borrower, and in any event within ninety (90) days thereafter, a balance sheet of the Borrower as at the end of such year and the related statements of income, capital and changes in financial position of the Borrower for such year, all in reasonable detail and satisfactory in scope to the Lender, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, which statements shall be prepared in accordance with GAAP on a review basis by independent certified public accountants of recognized standing selected by the Borrower and acceptable to the Lender, and shall fairly present the financial position and operations of the Borrower as of the end of such year;

    5.5.3 Within thirty (30) days after the Closing Date, and monthly thereafter, a budget and summary of the business plans and financial projections for the Borrower on a monthly basis for the next six (6) month period (including monthly balance sheets, statements of income and of cash flow) prepared

{503877;4}

by management and in form, substance and detail (including, without limitation, principal assumptions) satisfactory to the Lender, in its reasonable discretion, and executed by a shareholder of the Borrower;

5.5.4 As soon as practicable, but in any event within ten (10) days after the end of each fiscal month of the Borrower (i) a schedule of the accounts payable of the Borrower in form and substance reasonably satisfactory to the Lender, and (ii) a Borrowing Base Certificate in the form annexed hereto as Exhibit B (a "Borrowing Base Certificate");

5.5.5 Concurrently with the delivery of the financial statements required to be furnished pursuant to Sections 5.5.1 through 5.5.3 hereof, a Certificate signed by a Guarantor stating (a) that a review of the activities of the Borrower during such period has been made under his immediate supervision with a view to determining whether the Borrower has observed, performed and fulfilled all of its obligations under this Agreement, and (b) that there existed during such period no Default or Event of Default or if any such Default or Event of Default did exist, specifying the nature thereof, the period of existence thereof and what action the Borrower proposes to take, or has taken, with respect thereto;

5.5.6 Within ten (10) days of the end of each month, the Borrower shall provide the Lender with a report which shall identify and describe in detail satisfactory to the Lender, (i) all new Cases undertaken by the Borrower, and the fee arrangements with respect thereto, (ii) a status report and projection for all pending Cases which are included in the calculation of Anticipated Cash Flow in a report in form and substance satisfactory to the Lender (such report, a "Case Status Report"), (iii) the basis on which any Case was terminated (i.e. won, settled, or dismissed) and the terms thereof, or with respect to which the Borrower withdrew or was removed as counsel, and (iv) each Case which is a Settled Not Resolved Case or a Settled Resolved Case, and with respect thereto the terms of each settlement and a time estimate to conclusion, with respect to Settled Not Resolved Cases the amount of the fee sought by the Borrower, and with respect to the Settled Resolved Cases the amount of the fee awarded to the Borrower;

5.5.7 The Borrower shall submit to the Lender, within ninety (90) days of the end of each calendar year, a personal financial statement for the Guarantor, prepared on the Lender's form of personal financial statement;

5.5.8 The Borrower shall submit to the Lender a copy of the federal income tax return of the Guarantor within thirty (30) days of the filing thereof;

5.5.9 With reasonable promptness, such other information respecting the business, operations and financial condition of the Borrower or the Guarantor as the Lender may reasonably from time to time request; and

5.5.10 Immediately upon becoming aware of any development or other information which may materially and adversely affect the properties, business, prospects, profits or condition (financial or otherwise) of the Borrower or the Guarantor or the ability of the Borrower to perform or comply with this Agreement or to pay any of the Obligations, telephonic notice specifying the nature of such development or information and such anticipated effect.

5.6    Compliance.  The Borrower will comply with the requirements of all applicable laws, rules, regulations, orders of any governmental authority, and all agreements to which it is a party, the noncompliance with which laws, rules, regulations, orders and agreements would materially adversely affect the business operations, prospects or assets, or the condition, financial or otherwise, of the Borrower.

{503877;4}

5.7     ERISA.  The Borrower shall maintain compliance in all material respects with the applicable provisions of ERISA.  The Borrower will deliver to the Lender, promptly after the filing or receiving thereof, copies of all reports, including annual reports and notices, which the Borrower files with or receives from the PBGC or the U.S. Department of Labor under ERISA; and as soon as possible and in any event within thirty (30) days after the Borrower knows or has reason to know that any Reportable Event or Prohibited Transaction has occurred with respect to any Plan or that the PBGC or the Borrower has instituted or will institute proceedings under Title IV of ERISA to terminate any Plan, the Borrower will deliver to the Lender a certificate of the chief executive officer or chief financial officer of the Borrower setting forth the details as to such Reportable Event or Prohibited  Transaction or Plan termination and the action the Borrower proposes to take with respect thereto.

5.8     Change in Business.  The Borrower will not make any material change in the character of its business as carried on at the date hereof.

5.9     Notification to Lender.  The Borrower shall promptly notify the Lender of (i) any Event of Default, (ii) any Default, (iii) any litigation or proceedings that are instituted or threatened (to the knowledge of the Borrower) against the Borrower, any of its assets, or the Guarantor, (iv) each and every default by the Borrower under any obligation for borrowed money which would permit the holder of such obligation to accelerate its maturity, including the names and addresses of the holders of such obligation and the amount thereof, and (v) any change in the jurisdiction of formation or chief executive office of the Borrower or location of any of the Collateral from that listed in any of the Financing Agreements, in each case, describing the nature thereof and the action the Borrower proposes to take with respect thereto.

5.10    Further Assurances.  The Borrower will duly execute and deliver, or will cause to be duly executed and delivered, such further instruments and documents, including, without limitation, additional security agreements, Uniform Commercial Code financing statements or amendments or continuations thereof, and will do or use its best efforts to cause to be done such further acts as may be necessary or proper in the Lender's opinion to effectuate the provisions or purposes of this Agreement and the other Financing Agreements.

5.11    Additional Guarantor.  The Borrower shall promptly inform the Lender if any Person becomes a partner in the Borrower, and will cause such Person to guarantee the Obligations by executing a guarantee agreement in form and substance acceptable to the Lender.

5.12    Attorneys' Good Standing.  The Borrower shall use its best efforts to cause the Guarantor, and each attorney in its employ, to take such action as shall be necessary to maintain his license to practice law in the State of Texas.

5.13    Third Party Agreements.  The Borrower shall provide the Lender with a copy of each Third Party Agreement it enters into after the Closing Date.

**SECTION VI.**          **NEGATIVE COVENANTS**

The Borrower covenants and agrees that, until all of the Obligations are paid and satisfied in full, it shall comply, or cause compliance, with the following covenants:

6.1     Investments and Guarantees.

6.1.1 The Borrower shall not, directly or indirectly, make or permit to be outstanding any loan or advance to any Person or purchase or acquire any capital stock, assets, obligations or other

securities of, or make any capital contribution to, or otherwise invest in, or acquire any interest in, any Person, other than Cash Equivalents.

    6.1.2 The Borrower shall not, directly or indirectly, assume, guarantee, endorse or otherwise be or become directly or contingently responsible or liable for the obligations of any Person (including, but not limited to, an agreement to purchase any obligation, stock, assets, goods or services or to supply or advance any funds, assets, goods, or services other than in the ordinary course of business, or otherwise to assure the creditors of any Person against loss) other than guarantees by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

   6.2 <u>Limitation on Liens</u>.  The Borrower will not create, assume or suffer to exist any lien, mortgage, pledge or other encumbrance of any kind with respect to its real or personal property, whether now owned or hereafter acquired, except for: (i) liens in favor of the Lender, (ii) liens for taxes or assessments or other government charges or levies not yet due and payable or if due and payable being actively contested in good faith by appropriate proceedings and for which appropriate reserves are maintained; (iii) liens imposed by law, such as attorney's liens for services rendered with respect to the Cases, mechanics', materialmen's, and landlords' liens, securing obligations incurred in the ordinary course of business which are not past due or which are being actively contested in good faith by appropriate proceedings and for which appropriate reserves have been established; (iv) liens under workmen's compensation, unemployment insurance, social security or similar legislation; (v) liens, deposits, or pledges to secure the performance of leases, statutory obligations, surety and appeal bonds or other similar obligations arising in the ordinary course of business; (vi) judgment and other similar liens arising in connection with court proceedings, provided the execution or other enforcement of such liens is effectively stayed, and the claims secured thereby are being actively contested in good faith and by appropriate proceedings; and (vii) liens existing on the date hereof and listed on <u>Schedule 4.12</u> hereto (and extension, renewal and replacement liens upon the same property subject to such listed lien, provided that the amount secured by each such lien constituting such an extension, renewal or replacement lien shall not exceed the amount secured by the lien theretofore existing).

   6.3 <u>Additional Obligations</u>.  The Borrower shall not create, incur, assume or permit to exist any Indebtedness, except (i) all Indebtedness incurred under this Agreement and the Financing Agreements or any other agreement with the Lender; (ii) trade payables and current operating liabilities (other than for borrowed money), in each case incurred in the ordinary course of business and not more than thirty (30) days past due (of if past due the obligation with respect thereto is being actively contested in good faith and by appropriate proceedings); (iii) Indebtedness secured by liens referred to in Section 6.2; and (iv) all other obligations which are subordinate in right of payment to the Obligations of the Borrower hereunder, provided that the terms of such obligations and their subordination are previously approved by the Lender in writing, and provided that no such obligations shall be paid or prepaid other than in accordance with such terms as have been previously approved in writing by the Lender.  The Borrower shall not substitute any collateral with respect to any obligations to any creditor without the prior written consent of the Lender, which may be withheld in its sole discretion.

   6.4 <u>Return of Capital</u>.  The Borrower shall not return any capital to the Guarantor.

   6.5 <u>Mergers, Etc.</u>  The Borrower will not change its name, dissolve or otherwise sell or dispose of all or any substantial part of its assets, including its accounts receivable, and will not consolidate with or merge into another entity or business or permit one or more entities to consolidate with or merge into it.

   6.6 <u>Capital Expenditures</u>.  The Borrower shall not make capital expenditures in excess of $50,000 annually, measured on an aggregate basis.

{503877;4}

6.7    Retainers. The Borrower shall not amend or modify its retainer agreements for its Cases that would have the effect of eliminating, reducing, or diminishing the Obligations or extend the time of payment thereof, or release any lien, security or guarantee securing payment thereof.

6.8    Ownership and Management. The Guarantor shall, at all times, (i) own not less than ninety percent (90%) of the issued and outstanding partnership interests of the Borrower and (ii) serve as Managing Partner of the Borrower.

6.9    Compensation. The annual compensation payable to the Guarantor by the Borrower, including draws, bonuses and dividends, as in effect on the Closing Date, which amount is acknowledged to be $400,000 in the aggregate, shall not be increased without the Lender's consent; provided, however, that if no Loans or any other fees payable hereunder are outstanding, such consent shall not be unreasonably withheld.

6.10    Prepayments. The Borrower shall not, directly or indirectly, prepay, redeem, defease or refinance any Indebtedness, other than the Obligations in accordance with this Agreement.

6.10    Borrower to Bear Loan Costs. The Borrower will not, directly or indirectly, charge any cost related to this Agreement to any client, and will not directly or indirectly seek reimbursement from any client of any interest, costs, expenses or fees payable by the Borrower hereunder.

6.11    Amendment of Third Party Agreements. The Borrower will not amend or modify any Third Party Agreement previously supplied to the Lender in a manner that increases the co-counsel, referral or other fees payable by the Borrower pursuant to such agreement, without the prior written consent of the Lender.

**SECTION VII.      EVENTS OF DEFAULT/REMEDIES**

7.1    Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

7.1.1  The Borrower shall fail to pay when due the principal of any Loan or any fee, charge or other amount due hereunder or under any of the other Financing Agreements when such amounts become due and payable;

7.1.2  The Borrower shall fail to pay the interest on any Loan when such amount becomes due and payable;

7.1.3  If a default shall be made in the performance or observance of, or shall occur under, any covenant, agreement or provision contained in Sections 5.2.1, 5.3, 5.5, 5.7, or 5.10 of this Agreement, and such default shall continue for a period of ten (10) days after notice to the Borrower setting forth the default or defaults;

7.1.4  If a default shall be made in the performance or observance of, or shall occur under, any covenant, agreement or provision contained in this Agreement (other than as described in Sections 7.1.1, 7.1.2 and 7.1.3 above) or any of the other Financing Agreements or any other agreement between the Lender and the Borrower, or if this Agreement or any other Financing Agreements shall terminate, be terminable or be terminated or become void or unenforceable for any reason whatsoever without the prior written consent of the Lender;

7.1.5 If a default shall occur in the payment of any principal, interest or premium with respect to any Indebtedness or under any agreement or instrument under or pursuant to which any such Indebtedness or obligation may have been issued, created, assumed, guaranteed or secured by the Borrower and such default shall continue for more than the period of grace, if any, therein specified, or if any such Indebtedness shall be declared due and payable prior to the stated maturity thereof;

7.1.6 If any representation, warranty or other statement of fact made by or on behalf of the Borrower or the Guarantor herein or in any writing, certificate, report or statement at any time furnished to the Lender pursuant to or in connection with this Agreement or any Financing Agreements or otherwise, shall be false or misleading in any material respect when given;

7.1.7 If the Borrower or the Guarantor shall be unable to pay its or his debts generally as they become due; file a petition to take advantage of any insolvency act; make an assignment for the benefit of its creditors; commence a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself of a whole or any substantial part of its property; file a petition or answer seeking reorganization or arrangement or similar relief under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state;

7.1.8 If a court of competent jurisdiction shall enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of the Borrower or the Guarantor or of the whole or any substantial part of its or his properties, or approve a petition filed against the Borrower or the Guarantor seeking reorganization or arrangement or similar relief under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state; or if, under the provisions of any other law for the relief or aid of debtors, a court of competent jurisdiction shall assume custody or control of the Borrower or of the Guarantor or of the whole or any substantial part of its or his properties; or if there is commenced against the Borrower or the Guarantor any proceeding for any of the foregoing relief and such proceeding or petition remains undismissed for a period of sixty (60) days; or if the Borrower or the Guarantor by any act indicates its or his consent to or approval of any such proceeding or petition;

7.1.9 If (i) any judgment, remaining unpaid, unstayed or undismissed for a period of thirty (30) days is rendered against the Borrower or the Guarantor which by itself or together with all other such judgments rendered against the Borrower or the Guarantor remaining unpaid, unstayed or undismissed for a period of thirty (30) days, is in excess of $5,000, or (ii) there is any attachment, injunction or execution against the Borrower's or the Guarantor's properties remaining unstayed or undismissed for a period of thirty (30) days which by itself or together with all other attachments, injunctions and executions against the Borrower or the Guarantor's properties remaining unstayed or undismissed for a period of thirty (30) days is for an amount in excess of $5,000;

7.1.10 If the Borrower shall suspend or have suspended (voluntarily or involuntarily and for whatever reason) the operation of a material portion of its business for a period of twenty (20) business days;

7.1.11 If the Guarantor shall be disbarred or suspended from the practice of law;

7.1.12 If any of the following events shall occur or exist with respect to the Borrower, or any ERISA Affiliate under ERISA: any Reportable Event shall occur; complete or partial withdrawal from any Multiemployer Plan shall take place; any Prohibited Transaction shall occur; a notice of intent to terminate a Plan shall be filed, or a Plan shall be terminated; or circumstances shall exist which constitute grounds entitling the PBGC to institute proceedings to terminate a Plan, or the PBGC shall institute such proceedings; and in each case above, such event or condition, together with all other events

or conditions, if any, is not cured within thirty (30) days of notice thereof to Borrower or subjects the Borrower, or any ERISA Affiliate to any tax penalty, or other liability which in the aggregate may exceed $10,000; or

       7.1.13 Any change in the condition or affairs (financial or otherwise) of the Borrower or the Guarantor shall occur which, in the Lender's reasonable opinion, increases the material risk with respect to the Loans or impairs any of the Lender's security therefor.

      7.2   <u>Remedies</u>.  Upon the occurrence of any one or more of such Events of Default, the Lender may, at its option, without presentment for payment, demand, notice of dishonor or notice of protest or any other notice, all of which are hereby expressly waived by the Borrower, terminate the Commitment; declare any and all of the Loans to be due and payable together with interest at the default rate specified in the instruments or documents evidencing any of the Loans; <u>provided</u>, <u>however</u>, that if such event is an event specified in Section 7.1.7 or 7.1.8, then the Commitment shall automatically terminate and the Loans shall automatically become due and payable together with interest at the default rate specified in the instruments evidencing any of the Loans.  The Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of the State of New York and under the Uniform Commercial Code of any other state in which any Collateral or Guarantor Collateral may be situated, and, additionally, all of the rights and remedies set forth in this Agreement and the other Financing Agreements, and in any instrument or document referred to herein or therein, and under any other applicable law relating to this Agreement or the other Financing Agreements.  The Lender may, at its option, cure any default by the Borrower under any agreement with a third party which constitutes, or would with notice or lapse of time or both constitute, an Event of Default hereunder, and may add the amount expended in such cure to the Obligations and charge the Borrower's account therefor, such amounts to be repayable by the Borrower on demand; the Lender shall be under no obligation to effect such cure and shall not by making any payment for the Borrower's account be deemed to have assumed any obligation or liability of the Borrower.

## SECTION VIII.   <u>MISCELLANEOUS</u>

      8.1   <u>Expenses</u>.  The Borrower, whether or not the transactions contemplated hereby are consummated, shall pay to the Lender, or reimburse the Lender for, all out-of-pocket expenses incurred by the Lender in connection with the preparation, administration and enforcement of this Agreement, the other Financing Agreements, all other agreements, instruments and documents executed and delivered in connection herewith and therewith, and the transactions contemplated hereunder and thereunder, together with any amendments, supplements, consents or modifications which may be hereafter made or entered into in respect thereof, including, but not limited to, filing fees, expenses for searches, and the reasonable fees and disbursements of counsel to the Lender.

      8.2   <u>Survival of Agreement</u>.  All agreements, representations and warranties contained herein or made in writing by the parties hereto in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement, the other Financing Agreements and the consummation of the transactions contemplated herein or therein regardless of any investigation made by or on behalf of the Lender.

      8.3   <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise, and no delay in exercising on the part of the Lender, any right, power or privilege under this Agreement or under any of the Financing Agreements or other documents referred to herein or therein shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power and privilege.  The rights and remedies of the Lender hereunder and under the Financing Agreements and under any other present and

future agreements between the Lender and the Borrower are cumulative and not exclusive of any rights or remedies provided by law, or under any of said Financing Agreements or agreements and all such rights and remedies may be exercised successively or concurrently.

8.4    Notices.  All notices, approvals, consents, requests, demands or other communications (collectively, "Communications") to or upon the respective parties hereto shall be made in writing in one of the following ways and shall be deemed to have been given, received and dated:  if by hand (with receipt acknowledged), immediately upon delivery; if by express mail or any other overnight delivery service, one day after dispatch (unless the delivery service publicly announces that due to events beyond its control deliveries may not be made on the next day, then in accordance with the delivery schedule so announced by the delivery service); and if by certified mail, return receipt requested, four days after mailing.  All Communications are to be given to the following addresses (or to such other address as any party may designate by Communication in accordance with this Section):

> If to the Lender:
>
>> The Stillwater Asset-Backed Fund LP
>> 41 Madison Avenue – 29th Floor
>> New York, New York 10010
>> Attn:  Mr. Richard Rudy
>
> with copies to:
>
>> Warshaw Burstein Cohen
>>  Schlesinger & Kuh, LLP
>> 555 Fifth Avenue
>> New York, New York 10017
>> Attn: Marshall N. Lester, Esq.
>
> and
>
>> The Oxbridge Group LLC
>> 420 Lexington Avenue
>> New York, New York 10170
>> Attn:  Mr. Frederick Gorsetman
>
> If to Borrower:
>
>> Woodfill & Pressler, L.L.P.
>> 1330 Post Oak Boulevard, Suite 2800
>> Houston, Texas 77056
>> Attn:  Jared R. Woodfill V, Esq.

8.5    Amendments and Waivers.  Neither this Agreement, nor any of the other Financing Agreements or any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

8.6    Applicable Law.  This Agreement and the other Financing Agreements and any other document referred to herein or therein, and the obligations of the parties hereunder or thereunder, are

{503877;4}

being executed and delivered in New York, New York shall be construed and interpreted in accordance with the laws of the State of New York applied to agreements entered into and performed therein.

8.7   Successors.  This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by the parties and their respective heirs, successors and assigns, except that the Borrower may not assign its rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of the Lender.

The Lender may at any time assign all, or a part of its rights and obligations under this Agreement and the other Financing Agreements.  Prior to any such assignment, the Lender shall endeavor to give the Borrower written notice of such planned assignment, and the Borrower shall have the option, within fourteen (14) days of the receipt of such notice, to prepay the Loans, in whole, without any prepayment premium.  Notwithstanding the foregoing, the Lender shall have no liability of any kind to the Borrower if it fails to give such notice.  In the event that the Borrower learns without the giving of notice by the Lender that the Lender intends to assign the Loan, the Borrower shall be afforded the right to prepay the Loans as set forth in this Section for a period of fourteen (14) days from the Borrower learns of such proposed assignment.

8.8   Partial Invalidity.  If any provision of this Agreement or the other Financing Agreements is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement or the other Financing Agreements as a whole but this Agreement or the particular Financing Agreement, as the case may be, shall be construed as though it did not contain the particular provision or provisions held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by law.

8.9   Headings and Word Meanings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Agreement.  The words "herein," "hereinabove," "hereof," and "hereunder," when used anywhere in this Agreement, refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.  The singular shall include the plural, the masculine gender shall include the feminine and neuter and the disjunctive shall include the conjunctive, and vice versa, unless the context otherwise requires.

8.10   WAIVER OF JURY TRIAL.  THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE OTHER FINANCING AGREEMENTS OR ANY AGREEMENT, INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR THE VALIDITY, PROTECTION, INTERPRETATION, ADMINISTRATION, COLLECTION OR ENFORCEMENT HEREOF OR THEREOF, OR ANY OTHER CLAIM OR DISPUTE HEREUNDER OR THEREUNDER.

8.11   JURISDICTION; SERVICE OF PROCESS.  THE BORROWER HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK FOR THE COUNTY OF NEW YORK, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER FINANCING AGREEMENTS OR ANY AGREEMENT, DOCUMENT OR INSTRUMENT DELIVERED PURSUANT HERETO OR THERETO.  IN ANY SUCH LITIGATION, THE BORROWER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL

{503877;4}

DIRECTED TO IT AT ITS ADDRESS SET FORTH HEREIN, OR DESIGNATED IN WRITING PURSUANT TO, THIS AGREEMENT OR IN ANY OTHER MANNER PERMITTED BY THE RULES OF EITHER OF SAID COURTS.

8.12   <u>Conflicts</u>.  In the event that any provision of this Agreement conflicts with the Financing Agreements, or with any document or instrument delivered in connection herewith or therewith, the terms of this Agreement shall control, notwithstanding such conflict.

8.13   <u>Privileged Information</u>.   Nothing in this Agreement shall require the disclosure of confidential or privileged information in a manner that would adversely affect the Borrower's obligations or the applicability of any privilege.  The Lender shall have no right to request, and the Borrower agrees that it will not disclose to the Lender, privileged client information.  The Borrower agrees to indemnify the Lender from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Lender in any way relating to or arising out of the disclosure of confidential client information by the Borrower to the Lender whether pursuant to this Agreement or otherwise.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

WOODFILL & PRESSLER, L.L.P.

By: _____

Name: JESSOD R. WOODFILL

Title: MANAGING PARTNER

**THE STILLWATER ASSET-BACKED FUND LP**

By: _____

Name:

Title:

EXHIBIT A

<u>NOTICE OF BORROWING</u>

_____, 200_

THE STILLWATER ASSET-BACKED FUND LP
41 Madison Avenue
New York, New York 10010
Attention: _____

       1.    (a)  WOODFILL & PRESSLER, L.L.P. (the "<u>Borrower</u>"), pursuant to the Credit Agreement dated as of March 1, 2006 (the "<u>Credit Agreement</u>"), hereby requests The Stillwater Asset-Backed Fund LP (the "<u>Lender</u>") to make a Loan on the following terms:

| | |
|---|---|
| Principal Amount of Loan: | $ |
| Date of Loan: | |

       (b)  The Borrower requests the Lender to apply the proceeds of the Loan as follows:

| | |
|---|---|
| Transfer to financial institution and account shown below: Financial Institution: Account No.: | $ |
| Total (same as principal amount of Loan): | $ |

       (c)  All of the representations and warranties contained in the Credit Agreement or otherwise made to the Lender pursuant to the Agreement are true, complete and correct in all material respects. There exists no Default or Event of Default under the Credit Agreement. There have been no material adverse changes in the operations, business, property or assets or in the condition (financial or otherwise) of the Borrower or the Guarantor.

{503877;4}

2.      Capitalized terms used in this Notice shall have the meanings set forth in the Credit Agreement.

**WOODFILL & PRESSLER, L.L.P.**

By: _____
     Name:
     Title:

**EXHIBIT B**

<u>BORROWING BASE CERTIFICATE</u>

Date: _____, 200__

Anticipated Cash Flow:                          $_____

*times* Applicable Percentage:                          __%

    Subtotal:                          $_____

*minus* Loans Outstanding:                          $_____

    Availability                          $_____

The undersigned certifies that the information contained in this Certificate is correct and complete, and acknowledges that the calculation of the Availability is an accurate calculation based on the information contained in herein.

**WOODFILL & PRESSLER, L.L.P.**

By:_____

**EXHIBIT C**

## REVOLVING CREDIT NOTE

$5,000,000
New York, New York<br>March 1, 2006

A.     **GENERAL; TERMS OF PAYMENT**

    FOR VALUE RECEIVED, the undersigned, WOODFILL & PRESSLER, L.L.P., a Texas limited liability partnership (the "Borrower"), promises to pay to the order of THE STILLWATER ASSET-BACKED FUND LP, a Delaware limited partnership (the "Lender"), at its office at 41 Madison Avenue, New York, New York 10010, or at such other place as may be designated by the holder hereof in writing, the principal sum of FIVE MILLION DOLLARS ($5,000,000.00) or, if less, the aggregate unpaid principal sum of all Loans made by the Lender to the Borrower from time to time pursuant to a credit agreement, dated the date hereof, between the Borrower and the Lender (the "Credit Agreement"), on March 1, 2008.

    The Lender is hereby authorized to enter on the schedule attached hereto the amount of each loan and each payment of principal thereon, without any further authorization on the part of the Borrower or any endorser or guarantor of this Note, but the Lender's failure to make such entry shall not limit or otherwise affect the obligations of the Borrower or any endorser or guarantor of this Note.

    The Borrower will pay interest on the unpaid principal amount of each loan from time to time outstanding, computed on the basis of a 360-day year, at the rates provided in the Credit Agreement but in no event in excess of the maximum rate permitted by law.  Interest on the unpaid principal amount of the Revolving Loans shall be payable the first day of each month in each year, commencing on the first day of the first full calendar month after the date of this Note, at maturity (whether by acceleration or otherwise) and upon the making of any prepayment.  Upon the occurrence and during the continuance of an Event of Default (as defined in the Credit Agreement), the Borrower shall on demand pay interest, to the extent permitted by law, on the unpaid Obligations (as defined in the Credit Agreement) at a rate per annum equal to four (4%) percent in excess of the rate otherwise applicable to such Obligations, but in no event in excess of the maximum rate permitted by applicable law.

    All payments by the Borrower on account of principal, interest or fees hereunder shall be made in lawful money of the United States of America, in immediately available funds.  The Borrower authorizes (but shall not require) the Lender to debit any account maintained by the Borrower, at any date on which a payment is due under this Note, in an amount equal to any unpaid portion of such payment.  If any payment of principal or interest becomes due on a day on which the Lender is closed (as required or permitted by law or otherwise), such payment shall be made not later than the next succeeding business day, and such extension shall be included in computing interest in connection with such payment.

B.     **DEFAULT**

    Upon the occurrence of an Event of Default, as defined in the Credit Agreement, and during the continuance thereof, the Lender may declare the entire unpaid principal amount of this Note and all interest and fees accrued and unpaid hereon to be forthwith due and payable, whereupon the same shall

{503877;4}

immediately become and be forthwith due and payable, without present, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower.

C.    MISCELLANEOUS

1.    No Waiver; Rights and Remedies Cumulative.  No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Lender of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies herein provided are cumulative and not exclusive of any remedies or rights provided by law or by any other agreement between the Borrower and the Lender.

2.    Costs and Expenses.  The Borrower shall reimburse the Lender for all costs and expenses incurred by it and shall pay the reasonable fees and disbursements of counsel to the Lender in connection with the enforcement of the Lender's rights hereunder.

3.    Amendments.  No amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective unless the same shall be in writing and signed by the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

4.    Construction.  Except as herein provided, this Note shall be governed by the laws of the State of New York, without giving effect to its choice of law principles.  The Borrower hereby irrevocably consents to the jurisdiction of the Supreme Court of the State of New York for the County of New York, and the United States District Court for the Southern District of New York, in connection with any action or proceeding arising out of or relating to this Note, and the Borrower further irrevocably consents to the service or process in any such action or proceeding by the mailing of a copy of such process to the Borrower at the address set forth below.  In the event of litigation between the Lender and the Borrower over any matter connected with this Note, the right to a trial by jury is hereby waived by the Lender and the Borrower.

5.    Successors and Assigns.   This Note shall be binding upon the Borrower and its successors and assigns and the terms hereof shall inure to the benefit of the Lender and its successors and assigns, including subsequent holders hereof.

6.    Severability.  The provisions of this Note are severable, and if any provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall not in any manner affect such provision in any other jurisdiction or any other provision of this Note in any jurisdiction.

7.    Waiver of Notice; Set-off.   The Borrower hereby waives presentment, demand for payment, notice of protest and all other demands in connection with the delivery, acceptance, performance, default or enforcement of this Note.  The balance of every account of the Borrower with, and each claim of the Borrower against, the Lender existing from time to time shall be subject to a lien and subject to be set-off against any and all liabilities of the Borrower to the Lender, including those hereunder.

8.  <u>Credit Agreement</u>.  This Note is the Revolving Credit Note referred to in the Credit Agreement and the holder hereof is entitled to the benefits thereof and of the other Financing Agreements (as defined in the Credit Agreement).

**WOODFILL & PRESSLER, L.L.P.**

By: _____
    Name:
    Title:

# EXHIBIT C

## SECURITY AGREEMENT

SECURITY AGREEMENT (this "Agreement"), dated as of March 1, 2006, between WOODFILL & PRESSLER, L.L.P., a Texas limited liability partnership ("Borrower"), and THE STILLWATER ASSET-BACKED FUND LP, a Delaware limited partnership ("Lender"). The Lender and Borrower are concurrently entering into a credit agreement, dated as of even date herewith, (as amended, modified or supplemented from time to time in accordance with its terms, the "Credit Agreement") pursuant to which the Lender will make Loans (as such term is defined in the Credit Agreement) to the Borrower, pursuant to, and subject to the terms and conditions thereof.

Execution and delivery of this Agreement is a condition precedent to the making of the Loans.

The obligation of the Lender to make Loans is conditioned, among other things, on the execution and delivery by the Borrower of the Credit Agreement and this Agreement to secure the Obligations (as such term will be defined in the Credit Agreement), such Obligations to include, without limitation, the due and punctual payment and performance of (a) the principal of and interest and fees on the Loans, when and as due, whether at maturity, by acceleration, or otherwise, (b) all obligations of the Borrower at any time and from time to time under this Agreement and (c) all other obligations at any time and from time to time under the Credit Agreement, this Agreement and the other Financing Agreements.

Accordingly, the Borrower and the Lender hereby agree as follows:

1.     Definitions of Terms.  All capitalized terms used herein, but not defined herein, shall have the meanings set forth in the Credit Agreement.  As used herein, the following terms shall have the following meanings:

(a)     "Account" shall mean all present and future rights of the Borrower to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (i) for services rendered or to be rendered, or (ii) for a secondary obligation incurred or to be incurred.

(b)     "Chattel Paper," "Documents", and "Instruments" shall have the meanings set forth in the Uniform Commercial Code as in effect in the State of New York ("NYUCC").

(c)     "Collateral" shall have the meaning set forth in Section 2 hereof.

(d)     "Equipment" shall mean all of the equipment of the Borrower, including, without limitation, all machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.  Without limitation to the generality of the foregoing, such term shall also include all "Equipment" as defined in the NYUCC.

(e)     "General Intangibles" shall mean all of any Borrower's present and future general intangibles of every kind and description, including, without limitation, contract rights (including, without limitation, retainer agreements and other agreements with respect to compensation for services or reimbursement of expenses), payment intangibles, trade names and trademarks and the

{504061;1}

goodwill of the business symbolized thereby, deposit accounts, letters of credit, Federal, State and local tax refund claims of all kinds and domain names. Without limitation to the generality of the foregoing, such term shall also include all "General Intangibles" as defined in the NYUCC.

(f)      "Proceeds" shall mean any consideration received from the sale, lease, exchange or other disposition of any asset or property which constitutes Collateral, any other value received as a consequence of the possession of any Collateral and any payment received from any insurer or other person or entity as a result of the loss, nonconformity, or interference with the use of, defects or infringements of rights, or damage to any asset or property that constitutes Collateral, and shall include, without limitation, all cash and negotiable instruments received or held by the Lender pursuant to any lockbox or similar arrangement relating to the payment of Accounts or Receivables.

(g)      "Receivable" shall mean all of the following property of the Borrower: (a) all Accounts; (b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (c) all payment intangibles; (d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued and payable to the Borrower or otherwise in favor of or delivered to the Borrower in connection with any Account; or (e) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to the Borrower, whether from the rendition of services or otherwise associated with any Accounts, or general intangibles of the Borrower (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to the Borrower in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to the Borrower from any Plan or other employee benefit plan, rights and claims against insurance carriers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which the Borrower is a beneficiary).

(h)      "Records" shall mean all of the Borrower's files, present and future books of account of every kind or nature, invoices, ledger cards, statements, correspondence, memoranda, and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of the Borrower with respect to the foregoing maintained with or by any other person).

2.      Grant and Perfection of Security Interest.   (a) As security for the payment or performance, as the case may be, of the Obligations, the Borrower hereby creates and grants to the Lender, its successors and its assigns, a continuing security interest in, lien upon, and right of setoff against, and hereby assigns to the Lender, all personal property and fixtures and interests of the Borrower, whether now owned or hereafter acquired or existing and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by the Lender), collectively the "Collateral", including, without limitation, the following:

(i)      all Receivables;

(ii)     all General Intangibles;

(iii)    all goods, including, without limitation, Equipment;

(iv)    all Chattel Paper, including, without limitation, all tangible and electronic chattel paper;

{504061;1}                                                 2

(v)    all Instruments, including, without limitation, all promissory notes;

(vi)    all Documents;

(vii)    all deposit accounts;

(viii)    all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(ix)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of any Collateral, including (A) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, and (B) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(x)    all (A) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (B) monies, credit balances, deposits and other property of the Borrower now or hereafter held or received by or in transit to the Lender or at any other depository or other institution from or for the account of the Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xi)    all commercial tort claims;

(xii)    all Records; and

(xiii)    all products and Proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(b)    The Borrower irrevocably and unconditionally authorizes the Lender (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming the Lender as the secured party and the Borrower as debtor, as the Lender may require, and including any other information with respect to the Borrower or otherwise required by Article 9 of the Uniform Commercial Code of such jurisdiction as the Lender may determine in good faith, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof. The Lender hereby ratifies and approves all financing statements naming the Lender as secured party and the Borrower as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Lender prior to the date hereof and ratifies and confirms the authorization of the Lender to file such financing statements (and amendments, if any). The Borrower hereby authorizes the Lender to adopt on behalf of the Borrower any symbol required for authenticating any electronic filing. In the event that the description of the collateral in any financing statement naming the Lender as the secured party and the Borrower as debtor includes assets and properties of the Borrower that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by the Borrower to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral, provided, that, in such event, upon the Borrower's written request and at the Borrower's expense, the Lender shall file such amendments to its financing statements to change the assets described therein so as

to constitute the Collateral. In no event shall the Borrower at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming the Lender as secured party and the Borrower as debtor so long as this Agreement has not been terminated or all of the Obligations have not been paid and satisfied in full in immediately available funds.

(c)    For each deposit account that the Borrower, after the date hereof, opens, establishes or maintains, the Borrower shall, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (i) cause the depository bank to agree to comply at any time with instructions from the Lender directing disposition of the funds in the deposit account without further consent of the Borrower or (ii) arrange for the Lender to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to the Borrower. The terms of this subsection (c) shall not apply to (i) deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Borrower's salaried employees and (ii) attorney's escrow accounts, if the terms and conditions hereof would result in a breach by the Borrower of any provision of law or of any codified ethical responsibility.

(d)    In the event that any goods, documents of title or other Collateral are at any time after the date hereof in the custody, control or possession of another person, the Borrower shall promptly notify the Lender thereof in writing. Promptly upon the Lender's request, the Borrower shall promptly obtain an acknowledgment from such other person, in form and substance satisfactory to the Lender, that such other person, inter alia, acknowledges the security interest of the Lender in such Collateral, agrees to waive any and all claims such other person may, at any time, have against such Collateral, and agrees to permit the Lender access to, and the right to remain on, the premises of such other person so as to exercise the Lender's rights and remedies and otherwise deal with such Collateral and in the case of any person who at any time has custody, control or possession of any Collateral, holds such Collateral for the benefit of the Lender and shall agrees to act upon the instructions of the Lender, without the further consent of the Borrower.

(e)    The Borrower agrees at all times to keep in all material respects accurate and complete accounting records with respect to the Collateral, including, but not limited to, a record of all payments and Proceeds received.

3.    Further Assurances. The Borrower agrees to take any other actions reasonably requested by the Lender to insure the attachment, perfection of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the NYUCC or other applicable law, to the extent, if any, that the Borrower's signature thereon is required therefor, (ii) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (iv) obtaining the consents and approvals of any governmental and other third party consents and approvals, including, without limitation, any consent of any other person obligated on Collateral, (v) paying any fees and taxes required in connection with the execution and delivery of this Agreement or the granting of the security interest of the Borrower, and (vi) taking all actions required by any earlier versions of the NYUCC or by other law, as applicable in any relevant jurisdiction.